JOSEPH L. STURTEVANT *vs.* HENRY FORD & others.

Middlesex.　February 2, 1932. — September 22, 1932.

Present: RUGG, C.J., CROSBY, PIERCE, WAIT, FIELD, DONAHUE, & LUMMUS, JJ.

*Water Rights. Equity Jurisdiction,* Water rights. *Equity Pleading and Practice,* Decree; Master: findings of fact, report of evidence. *Damages,* In suit in equity, For interference with water rights.

It *was stated,* in a suit in equity by a riparian proprietor to enjoin an upper proprietor from unreasonably interfering with the waters of the stream, that, although there were no specific allegations in the bill on the point, it was germane to the nature and extent of injunctive relief to which the plaintiff might be entitled to determine the normal or average natural flow of the stream, when there was neither flood nor drought, and to ascertain some method by which that amount of flow could be measured, for the purpose of fixing the rights of the parties.

Where, upon appeal from a final decree in the suit in equity above described, it appeared from the report of a master that the defendant, about a quarter of a mile above the plaintiff's land, had constructed a dam in the stream, thus flowing a large area of the defendant's land which formerly had been swamp and marsh; that from such pond "there is a very considerable loss [of water] by way of evaporation and a very appreciable loss by way of seepage" to a neighboring watershed lower in elevation; that, by reason of the erection of such dam, there had been and would be "a marked diminution" in the amount of water passing through the plaintiff's land in the channel of the stream; that the defendant at times had had unused water in his pond which he had refused to release to alleviate the diminished flow of water to the plaintiff's land; and that, although the defendant had constantly intended to construct and erect a water wheel to be used at the dam for furnishing power, he had not done so and merely was keeping the waters of the stream in his pond for storage, a finding by the master, that such use of the waters of the stream by the defendant up to that time was unreasonable, was not plainly wrong nor inconsistent with his other findings and, the evidence not having been reported, must stand.

It appearing in the suit in equity above described that the only accurate method of determining the normal flow of the stream was to keep actual records thereof over a substantial period of time, which had not been done, it could not be said that a further finding by the master, that the normal flow of the stream through the premises of the plaintiff, after making allowance for the reasonable use of the stream by

the defendant as it passed through his premises, was four cubic feet per second, was erroneous, although it was based upon various calculations by hydraulic engineers of averages of flow which did not conform entirely to the facts of nature.

It further appeared in the suit in equity above described that the defendant, above his said dam, maintained two other artificial ponds on the stream, at one of which was a mill, and a small, artificial reservoir upon one of the tributaries of the stream, but that the use of the waters of the stream thereby made by him was not unreasonable. A final decree was entered enjoining the defendant, at times when he had sufficient water within his control to provide a flow of four cubic feet per second, "from so withholding the waters of . . . [the stream], and from so operating . . . [his] dams, gates and works, or any of them, as to deprive the plaintiff of a practically continuous flow of water . . . which shall be equal to four cubic feet per second . . . ." *Held*, that

(1) Although a flow of four cubic feet per second was not the actual natural flow of the stream, and there was not available an exact measure of the flow upon which to base the parties' rights, the plaintiff should be given relief from the defendant's unreasonable interference with the water of the stream, provided approximate justice could be done;

(2) It was proper to establish a minimum quantity of water to be released by the defendant in order to compensate the plaintiff for unreasonable diminution of the natural flow caused in the past by the defendant and likely to arise in the future;

(3) The relief given should have been confined to the defendant's lowest pond and his dam, where alone there had been unreasonable use of water to the harm of the plaintiff and where alone, so far as appeared, such unreasonable use was to be apprehended; the final decree was too broad in that it compelled the defendant to draw upon all his ponds and appliances in order to afford the stated flow to the land of the plaintiff.

For injuries of the character above described, a plaintiff generally is entitled to damages measured by depreciation in market value of his property if the injury is of a permanent nature, or by loss in the value of its use or occupation if the injury is occasional or temporary.

In the suit in equity above described, the plaintiff made no claim for diminution of the market value of his property. The master found that the property became "altogether untenable" for a period by reason of the defendant's diversion of water, and in assessing damages in a substantial sum took into consideration, in addition to an entire loss of use of the property for such period, interference with "the comfort of the plaintiff" and his wife arising from absence of water, loss of birds, the presence of objectionable vegetation on the plaintiff's land, obnoxious odors arising from pools in the bed of the stream thereon, the propagation of mosquitoes in such pools, and other matters. The master made no reference in assessing damages to the standard of comfort of ordinary people. *Held*, that

(1) Consideration of such obnoxious conditions was proper as bearing on a determination of the loss suffered by the plaintiff in the

diminution of the value of the use of his land, but the presence of such conditions was not a separate item of damage;

(2) The master's assessment of damages was not based upon the correct principle of law.

The disposition, in a suit in equity, of motions to amend a reference to a master so as to require him to report such evidence as either party might request and to require him to report certain testimony, rested in sound judicial discretion, and no abuse of discretion appeared in the denial of the motions.

BILL IN EQUITY, filed in the Superior Court on October 28, 1929, and afterwards amended, described in the opinion.

The suit was referred to a master. Upon the filing of his report, an interlocutory decree was entered by order of *Qua*, J., overruling the defendants' exceptions to the report except as to damages, and confirming it save in that respect; and recommitting the suit to the master. The defendants thereafter filed a motion that the order of reference to the master be amended so as to require him to report such portions of the evidence as any party might request. After the filing of the master's supplemental report, the defendants filed motions that the master be required to report certain evidence and that the suit again be recommitted to him. Material facts found by the master appear in the opinion. By order of the judge thereafter, there were entered an interlocutory decree confirming the master's first report in its entirety and the master's supplemental report, and denying all the defendants' motions; and a final decree providing that "the defendants and each of them, their agents, servants, attorneys and successors in title, be and they hereby are permanently restrained and enjoined, while they maintain their dams, or any of them, upon Hop Brook or its tributaries, and at times when they have sufficient water within their control to provide the flow hereinafter described, from so withholding the waters of Hop Brook, and from so operating their dams, gates and works, or any of them, as to deprive the plaintiff of a practically continuous flow of water in said brook which shall be equal to four cubic feet per second, provided however, that this decree shall not be deemed to require the defendants to

draw down the waters of Hagar's Pond, Bright's Pond or the reservoir on Stoneleigh Brook below the amount of water strictly necessary for the reasonable use of the mill at Bright's Pond or the amounts strictly necessary for reasonable use for domestic purposes at the Wayside Inn; and the defendants are further ordered to pay to the plaintiff as damages, within thirty days after the entry of final decree, the sum of $10,000, together with interest thereon . . . ."

The defendants appealed from each decree.

The case was argued in this court before *Rugg,* C.J., *Wait, Sanderson,* & *Field,* JJ., and, after the death of *Sanderson,* J., was submitted on briefs to *Crosby, Pierce, Donahue,* & *Lummus,* JJ.

*H. C. Thompson* & *H. Parker,* for the defendants.

*C. H. Baldwin,* for the plaintiff.

RUGG, C.J.    The plaintiff seeks by this suit in equity to restrain the defendants from maintaining certain dams so as to deprive him as a lower riparian proprietor of the natural flow of water in Hop Brook, to recover damages sustained by him through their alleged unreasonable interference with the waters of the brook, and for other relief. The real estate and water rights involved are in the town of Sudbury. The watershed of the brook comprises about four square miles. The principles of law governing the respective rights of upper and lower proprietors upon a stream are stated with citation of supporting authorities in *Stratton* v. *Mount Hermon Boys' School,* 216 Mass. 83, at pages 84–85: "The common law rights and obligations of riparian owners upon streams are not open to doubt. Although the right to flowing water is incident to the title to land, there is no right of property in such water in the sense that it can be the subject of exclusive appropriation and dominion. The only property interest in it is usufructuary. The right of each riparian owner is to have the natural flow of the stream come to his land and to make a reasonable and just use of it as it flows through his land, subject, however, to the like right of each upper proprietor to make a reasonable and just use of the water on its course through his land and

subject further to the obligation to lower proprietors to permit the water to pass away from his estate unaffected except by such consequences as follow from reasonable and just use by him.  This general principle, simple in statement, often gives rise to difficulties in its application.  What is a reasonable and just use of flowing water is dependent upon the state of civilization, the development of the mechanical and engineering art, climatic conditions, the customs of the neighborhood and the other varying circumstances of each case.  Often the amount and character of the flow may be modified to some extent by such use, for which, even though injurious to other proprietors, no action lies.  A stream may be so small that its entire flow may be abstracted by the ordinary domestic uses of a farmer.  Its bed may be so steep that its rational utilization for the generation of power requires its impounding in numerous reservoirs.  But whatever the condition, each riparian owner must conduct his operations reasonably in view of like rights and obligations in the owners above and below him.  The right of no one is absolute but is qualified by the existence of the same right in all others similarly situated.  The use of the water flowing in a stream is common to all riparian owners and each must exercise this common right so as not essentially to interfere with an equally beneficial enjoyment of the common right by his fellow riparian owners.  Such use may result in some diminution, obstruction or change in the natural flow of the stream, but the interference cannot exceed that which arises from reasonable conduct in the light of all circumstances, having due regard to the exercise of the common right by other riparian owners."  That decision held further that such reasonable use by a riparian proprietor must be confined to the watershed in question unless the diversion is so inconsiderable in amount as not to cause a present or potential injury to the use of the stream by the lower riparian proprietor.  One of the essential rights of a riparian owner is that he cannot be held responsible for injurious consequences resulting to others if he raises and uses a water power adapted and appropriate to the size and capacity of the stream and the quantity of

water usually flowing in it. The construction of dams and the other incidents of a water driven mill necessarily change the natural flow of a stream and derange to some extent the manner and time of flow of the current as it otherwise would come to the lower riparian owner. *Springfield* v. *Harris,* 4 Allen, 494, 496. *Thurber* v. *Martin,* 2 Gray, 394. *Gould* v. *Boston Duck Co.* 13 Gray, 442, 451. Such reasonable uses are not confined to the utilization of the water for power but extend to whatever purposes may be found to be just and reasonable. *Wood* v. *Edes,* 2 Allen, 578. See *Turner* v. *Nye,* 154 Mass. 579; *Nye* v. *Swift,* 190 Mass. 143.

The case was referred to a master to hear the evidence and to find and report the facts. The evidence was not reported. Under the familiar rule these findings of fact must be accepted as true unless plainly wrong, mutually inconsistent or contradictory or vitiated in view of controlling principles of law. The original and supplemental reports of the master are somewhat voluminous. A brief summary of the findings will suffice.

The plaintiff, after a long search for a very special kind of property susceptible of adaptation as an unusual country place to his peculiar uses and sensibilities and possessing features attractive to birds and waterfowl, bought, beginning in 1922, four parcels of wild land aggregating about six acres in area, and spent several years in developing the tract for his particular purpose at a total cost of about $40,000. The brook was the central feature of his plan and the use made by him of it, intended to gratify his own taste, was legal and reasonable. The defendants Ford (hereafter called the defendants) in 1923 bought the historic Wayside Inn estate and by subsequent purchases have acquired in all about three thousand acres. They are engaged in a development of a semiphilanthropic nature which is of substantial public interest and benefit. They have installed in the Wayside Inn a great variety of antique furniture, furnishings, pictures and documents. The place is visited by many thousands of people annually. They have also established an elementary school and a trade

school for boys. Upon the land of the defendants are several artificial ponds. The upper one known as Hagar's Pond appears to have been long in existence, not to be used for any practical purpose and to be incapable of being utilized as a storage reservoir because not furnished with any apparatus for drawing its water. The plaintiff makes no charge against the defendants with respect to that pond and it would drop out of the case but for effect upon it by the final decree. The one next lower on the stream, known as Bright's Pond, formerly afforded power for a grist mill. Its level has been raised about two feet by the defendants who have built a new grist mill operated by the water power thus made available. The present use of this mill is for demonstration in development of water power and for illustrating the methods of grinding and the variety of product of a grist mill of a century ago and not as a profitable commercial adventure. This use is partly for public education, partly to show what can be done with small New England streams and partly to provide the table of the Wayside Inn with its products. The master found that the raising of the level of this pond was not unreasonable in order to make the power of the brook available, that the use of its water was reasonable and that, if this were the only obstruction to the flow of the brook, the plaintiff's premises would be "supplied with very nearly the normal quantity of flow." This finding means in the light of the whole record and all the other findings that the plaintiff thereby has been and is caused no legal damage by that dam and the use of the water thereby raised. The defendants have constructed a small reservoir flowing less than two and one half acres on Stoneleigh Brook, a small confluent of Hop Brook, fed by springs and having its source and entire course on their land, for the purpose of using the impounded waters for drinking, sanitation and fire protection at the buildings on the Wayside Inn estate. The master finds that this proposed use is reasonable, that the little brook makes "a small contribution to Hop Brook and is of no great importance either one way or the other." The defendants about a quarter of a mile up-stream from

the land of the plaintiff constructed beginning in 1927 a dam on the brook whereby the Carding Mill Pond flowing about forty-two acres was created and have there erected a building of considerable size used chiefly for instruction of boys in useful trades. The area thus flowed was formerly swamp and marsh. The master found that the defendants have constantly intended to construct and erect a water wheel to be used at this dam for furnishing power for the operation of some kind of machinery in the building. It was found that the depth of the water at the dam was approximately five and one half feet and that the average net available horse power developed was slightly in excess of eight. He found also that by reason of the nature of the earth dividing the watershed of this pond from an adjacent watershed of lower elevation situated but a short distance from the pond there has been substantial loss of water to the brook as it enters the plaintiff's land. From this pond "there is a very considerable loss by way of evaporation and a very appreciable loss by way of seepage" to the neighboring watershed lower in elevation. The flow of the brook through the premises of the plaintiff "at no season of the year is more than approximately fifty per cent of what was its natural flow during any corresponding season in any year prior to the raising of the Bright's Pond Dam and the building of the Carding Mill Dam." This latter finding must be taken to relate to the year 1929 which was unusually and exceptionally dry and perhaps to the first half of 1930, the master's report having been filed in July, 1930. The period of observation on which this finding rested was not stated, although the language used given its common meaning indicates a long time. There were further findings that "During the summer of 1929 only a small amount of water passed over the spillway" at the Carding Mill Pond "and from thence down to the premises owned by the plaintiff." "There is not the slightest doubt, and I therefore find, that the exceptionally dry summer of 1929 created unusual conditions and that the plaintiff would have had less water than in former years flowing through his premises . . . even if there had been no obstruction to the natural

flow of the brook''; and that ''there has been and is and there will be in the future a marked diminution in the amount of water passing through the plaintiff's land by means of the channel of Hop Brook and that this is caused by the creation and maintenance of the Carding Mill Pond.'' There were further findings that all the present structures of the defendants are insufficient to store even a substantial part of the flood waters of Hop Brook and that it would be impracticable and unreasonable to construct such immense works as would be necessary to impound the flood waters and that the present storage facilities are so limited in capacity as to provide the natural flow of the stream for only seven and one half days if no water came from any other source.    There are further findings that the diminution in the flow of the brook in 1929 created disagreeable odors in the pools of the brook on land of the plaintiff and had a tendency to promote there the propagation of mosquitoes to an offensive extent and caused a considerable amount of objectionable vegetable growth which came to his premises.    These objectionable factors were due in part to the presence in the stream of the effluent of the sewerage beds of a neighboring city for which the defendants are in no way responsible.    That effluent is a fact of which both parties to this litigation must take cognizance and govern themselves accordingly.    So far as these objectionable factors were due to the defendants, they resulted from the obstruction caused by the Carding Mill Dam.    During 1929, when the land of the plaintiff did not receive the natural flow of the stream, there was water in the Carding Mill Pond unused by the defendants which might have been released by them into the brook to alleviate the conditions on the plaintiff's land and which they refused to release.

The ultimate findings with reference to the Carding Mill Pond were that the defendants thus far have made no use of its waters, that if a water wheel were installed for the purpose of furnishing power to run the small machines in the mill building, such use would be reasonable provided that this could be accomplished without diminishing the

natural flow of the brook but that the pond has resulted in considerable loss of water by evaporation and a very appreciable loss by seepage, that these facts and conditions make the maintenance of the dam and the level of the water in the pond as they now exist and the use of a water wheel at the dam unreasonable and that if no water wheel is installed the use of the water in the pond merely for creating a pond was unreasonable. The findings of the master are not in all respects clear. There is manifestly a fall in the brook capable of being utilized for power by the dam at the Carding Mill. Whenever a pond or reservoir is created there must be water surface from which some evaporation is certain to occur. There is no finding that the power created by the fall of the stream is too small to justify the creation of a pond so large as the Carding Mill Pond in all the conditions disclosed or that that pond was not adapted to the size and capacity of the brook. The ultimate finding in the light of all the circumstances set forth does not require the inference that the Carding Mill Pond and dam are not capable of reasonable use. The inference from the findings is that the use of the water of that pond thus far made by the defendants has not been reasonable with respect to the rights of the plaintiff as a riparian proprietor and that the diversion of the water from the brook by seepage into the adjoining watershed when the Carding Mill Pond is full has been excessive and has constituted a substantial diminution in the natural flow of the brook.

When the master's report came on to be heard it was recommitted to him "to determine what is the normal or average natural flow of the brook, when there is neither flood nor drought, and to report some method by which that amount of flow can be measured and determined on the ground by means of bench marks or other method which can be made readily available to the parties, and which can be referred to in the decree as fixing their rights."

Although there were no specific allegations in the bill on this point, the inquiry was germane to the nature and extent of injunctive relief to which the plaintiff might be

entitled.  In undertaking the inquiry thus laid upon him the master stated, in substance, as his guide the principles of law as to the respective rights of riparian proprietors laid down in *Stratton* v. *Mount Hermon Boys' School*, and quoted earlier in this opinion.

Pursuant to this order of recommittal the master found that the accurate method of ascertaining the flow of any watercourse is to keep a daily record over a considerable number of years and that no such record has been kept of Hop Brook.  Therefore a considerable amount of evidence was heard consisting chiefly of calculations made by hydraulic engineers based upon the area and nature of the watershed and records of the yield of water covering many years in the Sudbury River basin which adjoins the watershed in question.  Different methods of calculating the average natural flow of the brook were presented in testimony.  Manifestly the result of any such calculations does not conform to the facts of nature.  According to nature water does not flow in any stream by averages, but flows by extremes.  The rainfall in this Commonwealth as matter of common knowledge is not uniform in successive years or in the different months.  The variation is wide in both particulars.  The master finds that the run-off of the Hop Brook watershed varies greatly at different seasons of the year and that the calculated average for the months of July, August, September and October is less than one half the calculated average yearly run-off for the same period. Any such calculations must therefore be largely hypothetical and not practical.  Evidence of this nature in the absence of actual records is the only resort, according to the present state of the science, for estimating the flow of a stream, so far as shown on the record.  The master reports in some detail these different theories of calculating the average flow of a stream and the results of their application to the problem before him.  He stated amongst other matters that according to one computation (which he pronounced helpful and instructive) in August, 1910, and in July, 1926, there was no run-off whatever from the Hop Brook shed and a great many other months when it was

almost, if not wholly, negligible, although from other evidence he found that there was never a time until 1929 when there was not some flow in the brook. Some calculations would lead to an estimated flow of five cubic feet per second, but he did not adopt that because to do so would deprive the defendants of their right to the reasonable, beneficial use of the stream. He then proceeded in these words: "If the figure be fixed at four cubic feet per second, the intolerable conditions which existed on the plaintiff's premises in the summer of 1929 cannot and will not be repeated unless through wholly natural causes and through no fault of the defendants. An amount equal to four cubic feet per second will give the plaintiff a flow which will fill the bed of the brook through his premises and will, to a very considerable extent, allow the defendants to have the beneficial and reasonable use of the stream and a reasonable exercise of their riparian rights." This quotation bears some indication that the master estimated the rights of the plaintiff to "a flow which will fill the bed of the brook through his premises" as entitled to higher protection in law than the rights of the defendants to "the beneficial and reasonable use of the stream and a reasonable exercise of their riparian rights" which apparently in his view are entitled to protection only "to a very considerable extent." If that were the complete statement of the principles by which the master was guided, it would be wrong and his findings could not be accepted. The rights of both parties are equal. We are inclined to the opinion, though with some hesitation, that these statements were not intended to modify the full and accurate recital of the rules of law to which allusion has been made and according to which he asserted that he was guided.

The conclusion of the master is that the normal or average natural flow of the brook through the premises of the plaintiff when there is neither flood nor drought, and after making allowance for the reasonable use of the stream by the defendants as it passes through their premises, is four cubic feet per second. Whether that is a just estimate must depend upon the application of sound common sense to

the calculations in the light of observed facts and all the testimony, including the nature of the watershed, and the widest variations in rainfall and run-off. It is question of fact in its last analysis. Reliance must be placed on the findings of the master in the absence of a full report of the evidence. Those findings do not appear to be so extreme as to warrant the rejection of them.

The findings of the master respecting the uses made by the defendants of the waters of the brook cannot be pronounced plainly wrong or in vital particulars inconsistent and contradictory. It is not necessary to examine in detail the exceptions to these findings of the master. So far as material they are covered by what has been said. The interlocutory decree overruling all exceptions and confirming the master's report, except with reference to damage, was right. The finding as to the quantity of water constituting the normal or average flow of the brook cannot be held to be erroneous and must be accepted.

The result of all the findings is that there has been no use by the defendants of the waters of the brook in an unreasonable way except in connection with the Carding Mill Pond. The findings respecting that pond show that water has been kept for storage and not used in any way, that the operation of the mechanisms at the dam for releasing water has been such as to hold it back and prevent its flow into the brook, and that the seepage into the neighboring watershed has been excessive. This method of management of the pond has caused and is likely to continue to cause unreasonable interference with the rights of the plaintiff to the natural flow of the stream.

The difficult question is the kind of relief to which the plaintiff is entitled. The defendants have not unreasonably interfered with the rights of the plaintiff by any of their structures and uses of water except at the Carding Mill Pond. They have made no threats of unreasonable uses in the future at their other structures. Bright's Pond has been used for the operation of the grist mill and such use is reasonable. If it should cease to be so operated and that pond used entirely for storage or other purposes dif-

ferent questions might arise. Use of water of Stoneleigh Brook by the defendants as riparian proprietors for the domestic purposes, sanitation and fire protection of their buildings manifestly is reasonable. By their extensive purchases the defendants have united under one ownership the enumerated structures on the brook. But they are not indissolubly bound together. They may be severed in ownership in the future as they have been in the past. There is no reason why injunctive process should extend beyond the wrongs committed by the defendants. Injunction does not issue where no wrong has been done or threatened or is to be anticipated. Injunctive relief in the case at bar should be confined to the Carding Mill Pond where alone there has been unreasonable use to the harm of the plaintiff and where alone, so far as appears, such unreasonable use is to be apprehended. The terms of the final decree were too extensive in compelling the defendants to draw upon all their ponds and appliances in order to afford the stated flow to land of the plaintiff. As already pointed out the uses by the defendants of the waters of the brook have been reasonable except at the Carding Mill Pond. There are no indications from facts set out in the report that the uses of the brook by the defendants in the future will be in excess of their rights except at Carding Mill Pond.

A constant flow of four cubic feet per second in the brook as it enters the plaintiff's premises is something different from its actual natural flow. In some, if not in all, aspects it is more advantageous than the natural flow. It is a fixed and definite, in place of a highly variable, amount of water. But the defendants have interfered unreasonably with the natural, uncertain and inconstant flow to which the plaintiff was entitled. That interference must cease so far as it is unreasonable. The law must provide some means for adjusting the controversy between these parties. It ought not to stop short because perfect relief and an exact gauge for measuring rights are not available, provided approximate justice can be done. No alternative has been suggested to the finding of the master based on the calcula-

tions. No one knows what would be the actual natural flow of the stream. There are apparently no means of determining the flow based upon reasonable use of the Carding Mill Pond. No contention has been made that any practicable method is available to accomplish that result. The defendants cannot be compelled to maintain reservoirs for the benefit of the plaintiff. They have an absolute right to give up the maintenance of any or all of their structures on the stream. They may desist at any time from further maintenance of the Carding Mill Dam or the level of water in the pond raised thereby. Doubtless it would be less burdensome to the defendants to release water enough to maintain a regular flow in the brook so far as water is available at the Carding Mill Dam than to discontinue the Carding Mill Pond. In the absence of other method, there appears to be no alternative except to establish some minimum quantity of water to be released by the defendants at the Carding Mill Dam in order to compensate the plaintiff for unreasonable diminution of the natural flow caused in the past and likely to arise in the future from the maintenance of that pond. *Hittinger Fruit Co.* v. *Cambridge,* 218 Mass. 220, 225, 226.

The master has undertaken to set forth at some length the factors taken into account by him in assessing damages at.$10,000. The rule for determining damages in a case of this nature respecting injuries to real estate is plain. Succinctly stated: The plaintiff was entitled to recover compensation for all injuries to his estate which were the natural and proximate result of the wrongful acts of the defendants. Such damages commonly must be measured (1) by depreciation in market value, if the injury is of a permanent nature, or (2) by loss in rental value if the injury is occasional or temporary. Wrongful interference with enjoyment or comfort in the use of property entitles the injured landowner to compensatory damages including the reasonable expenses of repairing specific injury. So far as unpleasant conditions resulted interfering with the comfort of existence of the occupant of the premises, the question is not the actual effect upon a particular plaintiff or other

person or persons but the effect upon ordinary people acting reasonably in view of all the conditions. The fact that "vile odors" or a "stench" (to quote the words of the master) developed on the plaintiff's premises during the summer of 1929 does not constitute an independent element of damage. Unwholesome or offensive smells or swarms of insects or annoyance and inconvenience are not separate items of damage. Evidence of these and like disagreeable results of wrongful acts affecting real estate is competent as bearing upon damages arising from diminished value of its use and occupation or upon damages arising from injury of a permanent nature in case that is claimed. The plaintiff is entitled to compensation for wrongful interference with the use of his land. *Manning* v. *Woodlawn Cemetery Corp.* 239 Mass. 5, 8. *Matthews* v. *New York Central & Hudson River Railroad*, 231 Mass. 10, 18. *Stevens* v. *Rockport Granite Co.* 216 Mass. 486, 489. *Howes* v. *Grush*, 131 Mass. 207. *Emery* v. *Lowell*, 109 Mass. 197, 201. *Baltimore & Potomac Railroad* v. *Fifth Baptist Church*, 108 U. S. 317.

The master states that the plaintiff makes no claim for diminution in market value of the property. As we interpret the report that element was not taken into account in assessing damages and it drops out of the case. The master found that the plaintiff's property became "altogether untenable" in 1929, and states that in assessing damages he "took into consideration the total loss of use for the summer of 1929." The damage for occasional and temporary injury not of such permanent character as to affect market value could not commonly rise above total loss of rental value. Yet the master states that in addition to total loss of rental value he also took into consideration "the comfort of the plaintiff" and all of the conditions "which made the property less attractive, including the absence of water, loss of the birds, presence of objectionable vegetation, odors, mosquitoes, the presence of the deposit of sand in the bed of the brook" and certain other matters such as loss of the wild fowl and the fact that the plaintiff and his wife have been unable to entertain their friends. The master does not explain further what was meant by

"comfort of the plaintiff." Nowhere in the report is any reference to the standard of comfort affecting ordinary people but there are constant references to the plaintiff and his wife and the effect upon their feelings of various matters obnoxious to them. Considerable space in the report is devoted to the escape of sand from premises of the defendants during the construction of the Carding Mill Dam, which took lodgment in the bed of the brook on the plaintiff's land and thus changed somewhat its pebbly character. The finding in the original report was that the "presence of the sand does no particular harm and is objectionable only on account of the fact that the brook is more picturesque and generally satisfactory when flowing over a pebbly bottom than it is at present where it flows over those parts on the plaintiff's land which have been covered by sand." The master could not specify the cost of removal of the sand but found that such expense would be substantial. No finding was made that it would be a reasonable expenditure to attempt to remove the sand. There can be no property in birds of the air or waterfowl unless and until they are lawfully reduced to physical possession. *Dapson* v. *Daly*, 257 Mass. 195. *Commonwealth* v. *Hall*, 128 Mass. 410. Wrongfully to render the estate of another inhospitable to birds may be considered as affecting rental or market value. The master could not rightly add to the entire loss of use of the property further elements of damage including all such factors as those enumerated. He concludes this branch of the report by saying "It is very difficult to attempt to describe how one arrives at assessing damages in a case of this character" but that it seemed to him "that $10,000 was a fair and reasonable amount for the defendants to pay for the inconvenience and annoyance to which the plaintiff has been put and the expense to which the plaintiff is likely to be put in attempting to restore his property to its previous condition."

These and other statements in the report indicate that the master did not follow correct principles of law in assessing damages. The emphasis throughout appears to be to state the particular effect upon the plaintiff and not to

ascertain compensation for wrongful interference with the use of real estate.

No error is disclosed in the denial of the defendants' motions to amend the order of reference, and to require the master to report the evidence. The disposition of these motions rested in sound judicial discretion which does not appear to have been abused.

The result is that the interlocutory decree of December 10, 1930, confirming the master's report in part, is affirmed, and that of October 27, 1931, is reversed. The final decree is reversed because of error in the determination of damages. That decree is also wrong in respect to injunctive relief. If and when a final decree is entered, the relief, so far as injunctive in nature, must be confined exclusively to the Carding Mill Dam and the waters thereby held back, and reference to any and all other dams, gates and works of the defendants must be eliminated.

> *Interlocutory decree of December 10, 1930, affirmed.*
>
> *Interlocutory decree of October 27, 1931, reversed.*
>
> *Final decree reversed.*