FRANCO–AMERICAN CHAROLAISE, LTD., Mack M. Braly and Claudia M. Braly, Three B Land & Cattle Company, F.E. Bateman, Charles Bateman, W.A. Cannon, Gerald Don Stewart, Hershell Chronister, Jesse Berrie, Mrs. John Prater and Jack Dunn, Appellees,

v.

The OKLAHOMA WATER RESOURCES BOARD and the City of Ada, Oklahoma, Appellants.

No. 59310.

Supreme Court of Oklahoma.

April 24, 1990.

Readopted, Reissued and Rehearing Denied April 13, 1993.

Rehearing Denied June 14, 1993.

**570**

George W. Braly, Mack M. Braly, Messrs. Braly and Braly, Tulsa, for appellees.

Dean A. Couch, R. Thomas Lay, Oklahoma City, for appellant Oklahoma Water Resources Bd.

Joseph Rarick, Messrs. Younger & Files, Ada, for appellant City of Ada.

R. Steven Horn, Tulsa, for amicus curiae Oklahoma Wildlife Federation, Inc.

Diane Pedicord, Sue Ann Nicely, Oklahoma City, for amicus curiae, Oklahoma Mun. League.

Steven E. Moore, Diane Goldschmidt, Oklahoma City, for amicus curiae, Oklahoma Gas and Elec. Co.

Jay M. Galt, Messrs. Looney, Nichols, Johnson & Hayes, Oklahoma City, for amicus curiae, Oklahoma Rural Water Ass'n.

Robert D. Allen, Thomas Scott Jones, for amicus curiae, City of Oklahoma City and the Oklahoma City Mun. Improvement Authority.

Robert H. Anderson, Oklahoma City, for amicus curiae, McGee Creek Authority.

OPALA, Justice.

This appeal challenges the constitutionality of the 1963 amendments to Oklahoma's water law insofar as the amendments regulate riparian rights.[2] The case also raises a first-impression question about the interpretation of the requirements for perfecting an appropriative right under 82 O.S. 1981 § 105.12.[3] We affirm the trial court's findings of fact, holding that they are supported by substantial evidence.[4] The questions of law tendered for our resolution are:

1. What is the nature of the riparian right under Oklahoma common law?

2. To what extent did the 1963 amendments abrogate the common-law riparian right?

3. Are the 1963 amendments constitutional when measured by Art. 2, § 24 Okl. Const.?

4. Does 82 O.S.1981 § 105.12(2) require consideration of an applicant's available groundwater in determining its need for stream water?

5. Does 82 O.S.1981 § 105.12(4) require that an out-of-basin appropriation be granted subject to recall by in-basin

---

**2.** Laws 1963, ch. 205, § 1. For the text of the statute which includes the 1963 amendments, see this text accompanying *infra* note 16.

**3.** For the text of the statute, see *infra* note 57.

**4.** *Magnolia Pipe Line Company v. Cowen,* Okl., 477 P.2d 848, 850 [1970]. Appellant, Oklahoma Water Resources Board, argues that the trial court reweighed the evidence in contravention of the standard for judicial review of administrative determination. 75 O.S.1981 § 322. We disagree. The trial court held the Board's findings were unsupported by evidence and hence arbitrary.

riparian owners and appropriative users?

We hold that the Oklahoma riparian owner enjoys a vested common-law right to the reasonable use of the stream. This right is a valuable part of the property owner's "bundle of sticks" and may not be taken for public use without compensation.[5] We further hold that, inasmuch as 60 O.S.1981 § 60, as amended in 1963, limits the riparian owner to domestic use and declares that all other water in the stream becomes public water subject to appropriation without any provision for compensating the riparian owner, the statute violates Art. 2 § 24, Okl. Const.

In addition, we declare that the California Doctrine of stream water rights,[6] which recognizes riparian and appropriative rights as coexistent, is the prevailing law in Oklahoma; that the Oklahoma Water Resources Board [OWRB] may, in its discretion, find that an applicant for an appropriation has a need for stream water without regard to any claimed or perfected groundwater sources; that a perfected appropriative right is a vested right which may not be permanently divested except for nonuse after notice and hearing but is subject to senior appropriative rights and reasonable riparian uses during shortages; and that in the future a riparian owner seeking an appropriation of stream water must be deemed to have voluntarily relinquished his riparian rights in that stream water except for those preserved under the statute for domestic uses.

## A. STATEMENT OF THE FACTS

Mill Creek is a spring-fed dry weather creek in the Upper Clear Boggy watershed within the Muddy Boggy River Basin. Byrd's Mill Spring flows directly into Mill Creek which in turn flows into Clear Boggy Creek. Clear Boggy Creek is joined by Buck Creek and flows downstream as Clear Boggy Creek where it joins Muddy Boggy Creek to form the Muddy Boggy River. The latter is a tributary of the Red River. In 1980 the area experienced a severe drought and the stream bed in Clear Boggy Creek went dry. In August of 1980 the City of Ada [City] made application, pursuant to 82 O.S.1981 § 105.9, to increase its appropriation of water from Byrd's Mill Spring from 3,360 acre feet per year to 11,202 acre feet per year to meet a projected annual need of 10,523 acre feet per year by the year 2020. The City straddles two watersheds with approximately 80 percent in the South Canadian Stream Basin and 20 percent in the Clear Boggy Stream Basin. Riparian owners and in-basin appropriators objected to the City's application for additional stream water. The OWRB determined that the average yield of Byrd's Mill Spring is 9,820 acre feet per year. Prior appropriations, including that of the City and some appellee riparian owners, total 3,776 acre feet per year. Allowing 584 acre feet to supply domestic needs down to Buck Creek and 120 acre feet for unavoidable loss, the OWRB found the amount available for appropriation was 5,340 acre feet, 2,502 acre feet less than the 7,842 acre feet requested by the City. The City amended its application to conform to the finding. The OWRB then granted all 5,340 acre feet available for appropriation to the City, requiring the City to release at least 1,120 acre feet of water per year downstream. The OWRB order also required the City to meter and record monthly the amount of water taken from Byrd's Mill Spring. In-basin riparian owners and appropriators appealed from the administrative decision to the District Court, Coal County.[7]

---

5. Our holding today rests on independent and adequate state grounds. See *Michigan v. Long*, 463 U.S. 1032, 1041, 103 S.Ct. 3469, 3476, 77 L.Ed.2d 1201 [1983].

6. See *infra* note 15.

7. The terms of 75 O.S.1981 § 318 provide for district court review of agency decisions.

## B. COMMON-LAW AND STATUTORY AUTHORITY AFFECTING WATER RIGHTS

The Organic Act of 1890 [8] extended England's common law over Indian Territory. The same year the Territorial Legislature adopted a statute declaring the nature of water rights in the Territory:

"The owner of land owns water standing thereon, or flowing over or under its surface, but not forming a definite stream. Water running in a definite stream, formed by nature over or under the surface may be used by him as long as it remains there; but he may not prevent the natural flow of the stream, or of the natural spring from which it commences its definite course, nor pursue nor pollute the same." [9]

This codification of the common-law riparian doctrine of water rights remained the law in Oklahoma until legislative adoption of the 1963 amendments.

In 1897 the legislature provided for the appropriation of the ordinary flow or underflow of stream water for the irrigation of arid sections of the State.[10] The statute protected the riparian owner from the appropriation of the ordinary flow of the stream *without* the riparian owner's consent except by condemnation.[11] In 1905 the provision protecting the riparian right was omitted.[12] It was reinstated in 1909, then finally eliminated in 1910.[13] In 1925 the legislature added a provision recognizing the priority of all beneficial uses of water initiated prior to statehood.[14]

Since 1897 both the common law and the statutes have operated in Oklahoma to confer riparian and appropriative rights. Though these rights have coexisted in the State for almost 100 years, they are theoretically irreconcilable.[15] The common-law riparian right extends to the reasonable use of the stream *or* to its natural flow, depending on the jurisdiction; the appropriative right attaches to a fixed amount. The last riparian use asserted has as much priority as the first; the appropriator who takes first has the senior right. In 1963

---

**8.** The Organic Act of 1890, 26 U.S.Stat. at Large, ch. 182, § 31, provided for the adoption of Chapter 20 of the Mansfield's Digest of the Statutes of Arkansas, which included the common law, as the rule of decision in Indian Territory. As stated in *McKennon v. Winn,* 1 Okl. 327, 33 P. 582, 585 [1893], the people who settled Indian Territory on April 22, 1889, also brought with them the principles and rules of the common law *recognized by the American courts.* In 1889 an act of Congress creating a United States District Court for Indian Territory gave the court authority to apply the common law in the adjudication of cases within its jurisdiction. Finally, in 1893 the Territorial Legislature adopted the common law, originally placed at St.1893, § 3874, and now codified at 12 O.S. 1981 § 2. The riparian right was a part of the English and American common law that came to be extended over the State. See *infra* note 26.

**9.** Terr.Okla.Stat. § 4162 [1890].

**10.** Sess.Laws of Terr., Okl., ch. 19, art. I, §§ 1–21, pp. 187–195 [1897].

**11.** See *supra* note 10 at 188.

**12.** Sess.Laws of Terr., Okl., ch. 21, art. I, §§ 1–56, pp. 274–301 [1905].

**13.** Okla.Comp.Laws § 3918 [1909]. See 1 Okl. Rev.Laws § 3636, note 1 [1910] (provision with reference to "claims initiated prior to the passage of this act" was eliminated as having spent its force).

**14.** Sess.Laws of Okla., ch. 76, § 1 [1925] provides:

"Beneficial use shall be the basis, the measure and the limit of the right to the use of water, and all waters appropriated for irrigation purposes shall be appurtenant to specified lands owned by the person claiming the right to use the water, so long as the water can be beneficially used thereon. Priority in time shall give the better right. Provided, that in all cases of claims to the use of water initiated prior to November 15, 1907, the right shall relate back to the initiation of the claim and beneficial use of such water. All claims to the use of water initiated thereafter shall relate back to the date of receipt of an application therefor in the office of the state engineer, subject to compliance with the provisions of this chapter and the rules and regulations established thereunder."

**15.** This dual system of water rights is known nationally as the "California Doctrine" and at one time was the rule in all West Coast states and the tier of the Great Plains from North Dakota to Texas. Only California and Nebraska retain it. Most dual-system states have since adopted the appropriation doctrine as controlling all rights to stream water. See generally 5 Waters and Water Rights § 421 [R. Clark ed. 1972] and F. Trelease, Water Law *infra* note 27

the legislature attempted to reconcile the two doctrines. The amendments, shown in italics, are as follows:

> "The owner of the land owns water standing thereon, or flowing over or under its surface but not forming a definite stream. *The use of groundwater shall be governed by the Oklahoma Ground Water Law.* Water running in a definite stream, formed by nature over or under the surface, may be used by him *for domestic purposes as defined in Section 2(a) of this Act,* as long as it remains there, but he may not prevent the natural flow of the stream, or of the natural spring from which it commences its definite course, nor pursue nor pollute the same, *as such water then becomes public water and is subject to appropriation for the benefit and welfare of the people of the state, as provided by law; Provided however, that nothing contained herein shall prevent the owner of land from damming up or otherwise using the bed of a stream on his land for the collection or storage of waters in an amount not to exceed that which he owns, by virtue of the first sentence of this section so long as he provides for the continued natural flow of the stream in an amount equal to that which entered his land less the uses allowed in this Act; provided further, that nothing contained herein shall be construed to limit the powers of the Oklahoma Water Resources Board to grant permission to build or alter structures on a stream pursuant to Title 82 to provide for the storage of additional water the use of which the land owner has or acquires by virtue of this act."* [16]

Companion statutes limit riparian domestic use to household purposes, to the watering of domestic animals up to the land's normal grazing capacity, and to the irrigation of land not exceeding a total of three acres.[17] The riparian owner may also store a two-year supply for domestic use.[18] In addition, the 1963 amendments provided a validation mechanism as a method for protecting pre-existing beneficial uses, including those of the riparian owner and pre-existing appropriators. All subsequent rights to the use of stream water, except for riparian domestic uses, are to be acquired by appropriation.[19] The stream's natural flow is considered public water and subject to appropriation. Riparian owners may not assert their common-law right to the use of stream water other than for the domestic uses.[20]

## C. THE NATURE OF THE COMMON-LAW RIPARIAN RIGHT

■ Riparian rights arise from land ownership, attaching only to those lands which touch the stream. A riparian interest, though one in real property, is not absolute or exclusive; it is usufructuary in character and subject to the rights of other riparian owners.[21] A riparian right is neither constant nor judicially quantifiable *in futuro.*[22]

Under the natural flow doctrine, the riparian owner is entitled to have the water of the stream flow in its natural channel

at 11–13 (discussing the water law of other states).

**16.** Now codified at 60 O.S.1981 § 60. See Rarick, Oklahoma Water Law, Stream and Surface Under the 1963 Amendments, 23 Okla.L.Rev. 19 [1970] (discussing the legislative history and effect of the amendments).

**17.** 82 O.S.1981 § 105.1(B).

**18.** 82 O.S.1981 § 105.2(A).

**19.** See 82 O.S.1981 § 105.2 et seq. See also *Talley v. Carley,* Okl., 551 P.2d 248, 249 [1975], where we noted that the 1963 amendments set

forth a "comprehensive method for establishing water priorities" and applied the amendments to settle a dispute between *riparian* appropriators.

**20.** 60 O.S.1981 § 60. The 1988 amendments to Oklahoma water law expressly provide that the common law's riparian right is abrogated. Okl. Sess.L.1988, ch. 203, § 1. See text *infra* notes 59–61 for discussion of the application of the 1988 amendments to the instant case.

**21.** See generally 1 Water and Water Rights § 51 et seq. [R. Clark ed. 1967].

**22.** *Smith v. Stanolind Oil & Gas Co.,* 197 Okla. 499, 172 P.2d 1002, 1006 [1946].

without diminution or alteration.[23] The riparian owner has the right to the natural benefits of the stream irrespective of his need to put the water to use *even if he suffers no tangible harm* by a diminution of the stream. The natural flow doctrine, which prevents any consumptive use, was early modified to allow for "natural" or domestic uses such as bathing, drinking, gardening, and stock watering.

Because the natural flow doctrine when "pressed to the limits of its logic enabled one to play dog-in-the-manger"[24] and fostered waste, the majority of American courts have expressly adopted the reasonable use doctrine.[25] An Ohio court first espoused the reasonable use doctrine in 1832.[26] Its adoption was influenced by the rule that the riparian owner's remedy for interference with water rights was trespass on the case, an action requiring material injury. If the plaintiff can show no injury, the riparian owner's use is "reasonable" even though the normal flow of the stream is diminished.[27]

This court first declared its adherence to common-law doctrine of riparian rights in *Chicago, R.I. & P. Ry. Co. v. Groves.*[28]

The issue there was whether the defendant-railroad could obstruct a well-defined channel causing flood waters to back up on the plaintiff's land. The court held that the riparian owner has the right to the stream's continuous flow as it has been accustomed to run and that no one can obstruct its course *to the riparian owner's injury* without being liable for damages.[29] This court's consistent requirement of injury to the plaintiff is in line with its later express adoption of the reasonable use doctrine in *Broady v. Furray.*[30] In *Furray*, a natural obstruction of sediment created a water impoundment on the defendant's property. The plaintiff complained that seepage from the impoundment was ruining his crops. This court affirmed the *nisi prius* determination that the plaintiff's fishing resort would be damaged more by the removal of the obstruction than the defendant was harmed by its presence. The opinion states that the plaintiff and the defendant, *qua* riparian owners, had reciprocal rights and each has a right to the *reasonable* use of the stream.[31] Seven years later in *Martin v. British American*

23. The common-law maxim is *aqua currit et debet currere, ut currere solebat* (water runs, and ought to run, as it has used to run). Black's Law Dictionary, p. 95 [1979]. See also *Crawford Co. v. Hathaway,* 67 Neb. 325, 93 N.W. 781, 790 [1903] (insofar as it held that the appropriations doctrine had abrogated the common-law riparian right, *Hathaway* was overruled in *Wasserburger v. Coffee,* 180 Neb. 149, 141 N.W.2d 738, 743 [1966]).

24. *United States v. Gerlach Live Stock Co.,* 339 U.S. 725, 751, 70 S.Ct. 955, 968, 94 L.Ed. 1231, 1249 [1950].

25. Restatement (Second) of Torts § 850 Appendix, 22–23 [1982] and 7 Water and Water Rights § 611 at 36–42 [R. Clark, ed. 1976]. Though the natural flow doctrine is espoused in many American cases, Clark insists that no jurisdiction actually applies it. 5 Water and Water Rights § 424 at 285. Appellee riparian owners point to the common law of Arkansas, made applicable to Indian Territory through the Organic Act of 1890, *supra* note 8, as a source of their vested right to the natural flow of the stream. Yet, Arkansas never adopted the natural flow doctrine and expressly rejected it in 1955 for the reasonable use theory. *Harris v. Brooks,* 225 Ark. 436, 283 S.W.2d 129, 133 [1955].

26. *Cooper v. Hall,* 5 Ohio 321, 324 [1832]. Weil and Clark argue that the riparian right of the common law was not received in England until 1833. By then, American courts had already adopted both the natural flow doctrine in Tyler v. Wilkinson, 24 Fed.Cas. 472 [C.C.R.I.1827] and the reasonable use doctrine in *Cooper v. Hall, supra.* Weil, Waters: American Law and French Authority, 33 Harv.L.Rev. 133 [1919] and 7 Waters and Water Rights § 610 et seq. [R. Clark, ed. 1976]. See also *U.S. v. Gerlach, supra* note 24, 339 U.S. at 745, note 24, 70 S.Ct. at 966. But *cf.* Maass and Zobel, Anglo–American Water Law: Who Appropriated the Riparian Doctrine? 10 Public Policy 109 [1961].

27. See Restatement (Second) of Torts § 850 [1979].

28. 20 Okl. 101, 93 P. 755, 759 [1908].

29. *Supra* note 28. See also *Miller v. Marriott,* 48 Okl. 179, 149 P. 1164, 1165 [1915] and *Chicago, R.I. & P. Ry. Co. v. Morton,* 57 Okl. 711, 157 P. 917, 920 [1916].

30. 163 Okl. 204, 21 P.2d 770, 771 [1933].

31. *Broady v. Furray, supra* note 30.

*Oil Producing Co.*,[32] though using some language consistent with the natural flow doctrine, we held that a riparian owner may use the stream water as long as the use is *reasonable* and does not tend to injure or damage other riparian owners. The reasonableness of use was deemed a question for the jury.

"Natural flow" language has been used by this court when the plaintiff challenged an obstruction causing *too much water in the stream* to the plaintiff's injury.[33] But a careful reading of our decisions involving the *taking of water from a stream* reveals that, even when the natural flow doctrine is mentioned in *dicta*, the reasonable use doctrine is actually applied. In *Smith v. Stanolind Oil & Gas Co.*[34] we allowed Stanolind, a lessee of a riparian owner, to diminish the flow of the natural stream as long as Stanolind left water sufficient for domestic use and for approximately 45 head of cattle. We quoted with approval from a Vermont decision:

> "The fact that such orators [plaintiffs in chancery] were taking the water to their non-riparian lands did not *per se* make their use unreasonable. But that fact together with the size and character of the stream, the quantity of water appropriated, and all the circumstances and conditions, might make their use *unreasonable*. The stream might furnish enough to supply this unreasonable use of the defendants and the reasonable demands of the orators [plaintiffs in chancery], in which case the latter could not be heard to complain. *The mere fact that the defendants reduce the natural flow of the stream would not be decisive....*" [Emphasis added.][35]

We said that the accepted rule allows a riparian owner the right to make any use of water beneficial to himself as long as he does not substantially or materially injure those riparian owners downstream who have a corresponding right.[36] In *Baker v. Ellis*,[37] a case relied on by the trial court in holding that the natural flow doctrine controls the case at bar, we affirmed a decree granting a permanent injunction against the defendant's construction of a dam which threatened the supply of water to a downstream riparian owner. Though the court noted that the defendant was about to stop the stream "where the water, left alone, would run as it ought to run, and was used to run from time immemorial," we carefully added that the defendant could still properly use the water *even impounding some as long as he does not cause substantial damage to the plaintiff.*[38]

Mindful of these decisions and of the co-existence of appropriative with riparian rights in this state since 1897, we hold that the modified common-law[39] riparian right to the reasonable[40] use of the stream is the controlling norm of law in Oklahoma.[41] We further hold that, consistently

32. 187 Okl. 193, 102 P.2d 124, 126 [1940].

33. See cases in *supra* note 29.

34. 197 Okl. 499, 172 P.2d 1002, 1004 [1946].

35. *Supra* note 34, 172 P.2d at 1005–1006 (quoting *Lawrie v. Silsby*, 82 Vt. 505, 74 A. 94, 96 [1909] ).

36. *Supra* note 34 at 1005.

37. Okl., 292 P.2d 1037 [1956].

38. *Baker v. Ellis, supra* note 37, 292 P.2d at 1037–1039.

39. See 12 O.S.1981 § 2 which reads in part: "The common law, as modified by constitutional and statutory law, judicial decisions and the condition and wants of the people, shall remain in force in aid of the general statutes of Oklahoma...."

40. Reasonableness is a question of fact to be determined by the court on a case-to-case basis. Factors courts consider in determining reasonableness include the size of the stream, custom, climate, season of the year, size of the diversion, place and method of diversion, type of use and its importance to society (beneficial use), needs of other riparians, location of the diversion on the stream, the suitability of the use to the stream, and the fairness of requiring the user causing the harm to bear the loss. See Restatement (Second) Torts § 850A [1979].

41. The adoption of the reasonable use doctrine has been effected without constitutional implications. The United States Supreme Court has stated that the adoption of the English common-law riparian doctrine "is far from meaning that patentees of a ranch on the San Pedro are to have the same rights as owners of an estate on the Thames" and that the adoption of the com-

with the California Doctrine, the statutory right to appropriate stream water coexists with, but does not preempt or abrogate, the riparian owner's common-law right.

## D. THE CONSTITUTIONAL QUESTION

■ The issue here is whether the legislature can validly abrogate the riparian owner's right to initiate non-domestic reasonable uses in stream water without affording compensation. Art. 2, § 24, Okl. Const. provides in part:

"Private property shall not be taken or damaged for public use without just compensation. Such compensation, irrespective of any benefit from any improvements proposed shall be ascertained by a board of commissioners· of not less than three freeholders, in such a matter as may be prescribed by law."

Private property protected by Art. 2, § 24 includes "easements, personal property, and *every valuable interest which can be enjoyed and recognized as property.*" [42] Further, In *Oklahoma Water Resources Board v. Central Oklahoma Master Conservancy District,*[43] we held:

"A 'vested right' is the power to *do certain actions* or possess certain things lawfully, and is substantially a property right. It may be created by common law, by statute or by contract. Once created, it becomes absolute, and is protected from legislative invasion ..." [Emphasis added].

Therefore, the common-law riparian right to use stream water, as long as that use is reasonable, has been long recognized in Oklahoma law as a private property right.[44]

■ The general rule is that the legislature may restrict the use of private property by exercise of its police power for the preservation of the public, health, morals, safety and general welfare without compensating the property owner.[45] In *Phillips Petroleum Co. v. Corporation Com'n*[46] this court defined the permissible exercise of police power:

"[T]he police power is usually exerted merely to regulate the use and enjoyment of property by the owner, or, if he is deprived of his property outright, it is not taken for public use, but rather destroyed in order to promote the general welfare...."

Therefore, in *C.C. Julian Oil & Royalties Co. v. Capshaw*[47] we declared that the legislature could regulate a landowner's use and enjoyment of natural resources to prevent waste and infringement on the rights of others. Thus, a statutory regulation of the methods to be used in extracting hydrocarbons was a constitutional exercise of police power where none of the hydrocarbons was taken for public use. Then, in *Frost v. Ponca City*[48] we held that in the interest of health and safety, the city could exercise its police power to restrict the plaintiff's right to capture hydrocarbons

mon law is merely the adoption of a general system of law. *Boquillas Land & Cattle Co. v. Curtis,* 213 U.S. 339, 345, 29 S.Ct. 493, 495, 53 L.Ed. 822 [1909].

**42.** *Graham v. City of Duncan,* Okl., 354 P.2d 458, 461 [1960].

**43.** Okl., 464 P.2d 748, 755 [1969] (Emphasis added).

**44.** E.g. *Atchison, T. & S.F. Ry. Co. v. Hadley,* 168 Okl. 588, 35 P.2d 463, 465 [1934].

**45.** *C.C. Julian Oil & Royalties Co. v. Capshaw,* 145 Okl. 237, 292 P. 841 [1930] (Syllabus 3). No one argues here that the taking of stream water by the 1963 amendments is not done for a valid public purpose as required by Art. 2 § 24, Okl. Const. See *Delfeld v. City of Tulsa,* 191 Okl. 541, 131 P.2d 754 [1943]. The purposes underlying the 1963 amendments

are summarized in the statute, 82 O.S.1981 § 1086.1(B), as follows:
"B. The exercise of the powers granted by this act are in all respects for the benefit of the people of the state, for the increase of their commerce and prosperity and for the improvement of their health and living conditions. The primary purpose governing all exercise of powers hereunder shall be to maximize and not to minimize the alternatives available to all citizens, municipalities and other water-user entities in acquiring water for beneficial use."

**46.** Okl., 312 P.2d 916, 921 [1956] (quoting 29 C.J.S. § 6); see also *Mattoon v. City of Norman,* Okl., 617 P.2d 1347, 1349 [1980].

**47.** *Supra* note 45, 292 P. at 847.

**48.** Okl., 541 P.2d 1321, 1324 [1975].

underlying his property, but the city could not remove the hydrocarbons and sell them without compensating the plaintiff.

■ We, therefore, hold that the 1963 water law amendments are fraught with a constitutional infirmity in that they abolish the right of riparian owners to assert their vested interest in the prospective reasonable use of the stream. Under the 1963 amendments, riparian owners stand on equal footing with appropriator; ownership of riparian land affords *no right* to the stream water except for limited domestic use.

This case must be remanded for the trial court to determine whether the appellee-riparian owners' claim to the use of the stream flow for the enhancement of the value of the riparian land for recreation, for the preservation of wildlife, for fighting grass fires, and for lowering the body temperature of their cattle on hot summer days is reasonable.

The OWRB argues the 1963 amendments are a permissible exercise of the police power just as a zoning ordinance would be. That contention is inapposite when, as here, the use of stream water is *not just restricted but is taken for public use.*

Although the 1963 water law amendments provided a mechanism for a riparian owner to "perfect" all beneficial uses initiated prior to the legislation, that mechanism falls short of protecting the riparian owner's common-law appurtenant right. The mechanism is constitutionally inadequate first of all because the full sweep of the riparian right is much broader than the validation mechanism could ever shield. The heart of the riparian right is the right to assert a use at *any time* as long as it does not harm another riparian who has a corresponding right. Further, yesterday's reasonable use by one riparian owner may become unreasonable tomorrow when a fellow riparian owner asserts a new or expanded use. After the 1963 amendments, the riparian owner who wants to expand a use or assert a new use may do so *only as*

*an appropriator.* His use is not judged by its reasonableness but only by its priority in time.

Furthermore, the validation mechanism attempted to forever set in stone the maximum amount of stream water the landowner, *as a riparian owner,* can use. Any use asserted by the landowner, *as an appropriator,* is either denied because no water is available or is given a lower priority than all other uses, including those of appropriators who are non-riparian to the stream. It matters not that the riparian owner's use is reasonable when compared with prior uses. This result is antithetical to the very nature of the common-law riparian right, which places no stock in the fact of past use, present use, or even non-use.

The 1963 legislation is also constitutionally inadequate because it falls short of an express abrogation of a riparian owner's common-law right. We held in *Ricks Exploration Co. v. Oklahoma Water Resources Board* [49] that public law will not be interpreted as legally destroying private rights by inference. Until the recent 1988 amendments to our water law, the riparian owner was never given express notice by the legislature that his use would be limited in the future to that validated under the 1963 amendments. By then, the time for "perfection" under the validation mechanism had passed.

In preserving today the riparian right from its infirm legislative abrogation, we do not disestablish the appropriative right. California and Nebraska, which still maintain the dual regime of water rights,[50] protect appropriative rights, prior reasonable uses of the riparian owner and prospective reasonable uses of the riparian owner. In *U.S. v. Gerlach Live Stock Co.*[51] the United States Supreme Court, interpreting California law, held that the plaintiff's use of even the normal *overflow* of the stream for irrigation purposes was reasonable, and therefore, compensable.

**49.** Okl., 695 P.2d 498, 504 [1984].

**50.** *See supra,* note 15.

**51.** *Supra* note 24, 339 U.S. at 754–755, note 24, 70 S.Ct. at 970.

The asserted riparian use must, of course, be reasonable. Therefore, in a later case, *Joslin v. Marin Municipal Water District*,[52] the California Supreme Court held that the plaintiffs' use of the normal flow of the stream for the purpose of accumulating rock, sand and gravel for their rock and gravel business was not a reasonable use. The court, which ruled that the plaintiffs had a compensable interest only in the reasonable use of the flow of the water, balanced the plaintiffs' use against the need to preserve the state's water supply and the constitutional mandate preventing waste and unreasonable use.

Upon remand, should the trial court find that any or all of the riparian owners' asserted uses of the stream for their claimed purposes is unreasonable, such uses do not fall under the mantle of constitutionally protected property rights. On the other hand, should the trial court find that an asserted riparian use of the stream is reasonable, the right to a flow sufficient to supply the riparian owners' reasonable use must be preserved in the owners.

On remand the trial court shall separately determine the reasonableness of each of the riparian owners' asserted uses, applying the factors discussed earlier.[53] One use may be found reasonable while another

is not. We make no conclusion as to the reasonableness of any of the riparian owners' asserted uses.

■ To assure that the state's resources are put to the most reasonable and beneficial use, we adopt the approach of the Supreme Court of Nebraska in *Wasserburger v. Coffee*.[54] *Wasserburger* holds that the rights of the riparian owner and the appropriator are to be determined by relative reasonableness. On remand, the trial court shall balance the riparian owners' uses against those of the City, with due consideration to be given all the factors listed earlier in this opinion.

The OWRB shall approve the City's appropriation only if it finds there is surplus water after providing for 1) all prior appropriations; 2) all riparian uses perfected under the 1963 amendments; 3) all *riparian* domestic uses, 4) all riparian uses approved as reasonable on remand and 5) all anticipated in-basin needs.[55] In its calculation, the OWRB must take into account the last riparian owner and the last appropriator on the stream and maintain the minimum flow [56] necessary to allow for diversion by these users. We affirm the trial court's ruling that all downstream domestic uses below the junction of Buck and Boggy

---

**52.** 67 Cal.2d 132, 60 Cal.Rptr. 377, 429 P.2d 889, 898 [1967].

**53.** See *supra* note 40. In determining whether the riparian owners' use of streamwater to preserve wildlife is reasonable, the trial court should consider that uncaptured wildlife is the property of the state under 29 O.S.1981 § 7–204. The trial court should also consider the right of the riparian owner to fish in riparian waters and the right of the landowner to capture wildlife on his property. Other courts have held that a riparian owner's use of stream water for recreational purposes is reasonable. E.g. *Taylor v. Tampa Coal Co.*, 46 So.2d 392 [Fla.1950]; *Hoover v. Crane*, 362 Mich. 36, 106 N.W.2d 563 [1960]; *Bach v. Sarich*, 74 Wash.2d 575, 445 P.2d 648 [1968]; *Scott v. Slaughter*, 237 Ark. 394, 373 S.W.2d 577 [1964]; *Sturtevant v. Ford*, 280 Mass. 303, 182 N.E. 560 [1932].

**54.** 180 Neb. 149, 141 N.W.2d 738, 743 [1966].

**55.** For a discussion of the appropriation statute's provision for in-basin needs see text *infra* notes 71–73.

**56.** Since we hold here that the reasonable use doctrine, not the natural flow doctrine, is controlling, the OWRB shall maintain a flow in the stream sufficient to supply the riparian owners' reasonable use which may or may not be the "natural flow." For example, should the trial court find the riparian owners' use of the stream for the preservation of wildlife is a reasonable use, the OWRB shall maintain a flow in the stream sufficient to support wildlife. The OWRB need not allow for a flow in the stream in excess of the amount needed to supply the reasonable use. In holding that the riparian owners' right to the natural flow of the stream must be preserved by the OWRB in granting an appropriation, the trial court did not presume to dictate to the OWRB how much water should be left in the stream. For guidance only, the trial court suggested that the OWRB "consider making minimal provisions for water flows consistent with times of little runoff during normal rainfall seasons, or possibly dryer than normal seasons, but excluding periods of drought." Likewise, we will not presume to tell the OWRB how much water must be left in the stream to supply each reasonable use.

Creeks and above its junction with Muddy Boggy Creek must be considered to determine the water available for appropriation.

## E. GRANTING THE APPROPRIATION

*The Consideration of Other Sources of Water*

■ The next issue for review is whether the OWRB must consider the City's claim to groundwater when determining its need to appropriate stream water. Title 82 § 105.12(2) requires the OWRB to determine whether the applicant has a present or future need for the water.[57] The trial court ruled the OWRB must consider the City's claim to groundwater sources in assessing whether the City indeed has a need for the water it seeks to appropriate. The 1988 amendments to our statutory water law address this issue by adding the following clarifying language to 82 O.S.1981 § 105.12:

*A.* After the hearing on the application the Board shall determine from the evidence presented whether:

1. There is unappropriated water available in the amount applied for;

2. The applicant has a present or future need for the water and the use to which applicant intends to put the water is a beneficial use; and. *In making this determination, the Board shall consider the availability of all*

*stream water sources and such other relevant matters as the Board deems appropriate, and may consider the availability of groundwater as an alternative source;* [amendments in italics; deletions noted][58]

The title of the Act that embodies the 1988 amendments expresses a purpose to clarify the language of the statute. We hold that by the language added to 82 O.S.1981 § 105.12(2) the legislature intended to explain the 1963 amendments rather than to amend them. In so doing the legislature expressed its intent to apply the added language in § 105.12 retroactively from the effective date of the 1963 amendments.[59]

Furthermore, we held in *American Ins. Ass'n v. Industrial Com'n*[60] that:

"[u]nless there be present on review some *property or liberty interest* which requires that we apply to the accrued or vested rights in controversy the law in force at a fixed point in time that is anterior to its most recent change, an amendment of controlling statutory law between nisi prius and appellate decisions compels the appellate court to apply the latest version of the pertinent law."[61]

Because the legislature has intervened following our initial consideration of this case and before our final disposition and because the legislature expressed an intent to

---

57. Before the 1988 amendments [Okl.Sess.L. 1988, ch. 203 § 3], 82 O.S.1981 § 105.12 provided as follows:

"After the hearing on the application the Board shall determine from the evidence presented whether:
1. There is unappropriated water available in the amount applied for;
2. The applicant has a present or future need for the water and the use to which applicant intends to put the water is a beneficial use; and
3. The proposed use does not interfere with domestic or existing appropriative uses.
4. In the granting of water rights for the transportation of water for use outside the stream system wherein water originates, applicants within such stream system shall have a right to all of the water required to adequately supply the beneficial needs of the water users therein. The Board shall review the needs within such area of origin every five (5) years. If so determined, the Board shall ap-

prove the application by issuing a permit to appropriate water. The permit shall state the time within which the water shall be applied to beneficial use. In the absence of appeal as provided by this act, the decision of the Board shall be final."

58. Okl.Sess.L.1988, ch. 203 § 3.

59. See *In re Bomgardner,* Okl., 711 P.2d 92, 95 [1985] (Presumption that legislature intended statute to be applied only prospectively is rebuttable).

60. Okl., 745 P.2d 737, 740 [1987].

61. *American Ins. Ass'n v. Industrial Com'n, supra* note 60, quoting *Diffenderfer v. Cent. Baptist Church of Miami, Fla., Inc.,* 404 U.S. 412, 414–415, 92 S.Ct. 574, 575–576, 30 L.Ed.2d 567 [1972] and *Thorpe v. Housing Authority of City of Durham,* 393 U.S. 268, 282–283, 89 S.Ct. 518, 526, 21 L.Ed.2d 474 [1969].

clarify the 1963 amendments and to apply the language added by 82 O.S.Supp.1988 § 105.12, we are now compelled to retroactively apply the legislature's latest version of the pertinent law. No vested property or liberty interest requires an opposite conclusion.

■ Conforming to the legislative clarification of § 105.12(2), we reverse the trial court's holding that the OWRB must consider all sources of water claimed by the City in determining the City's need for stream water. Pursuant to the statute, the OWRB *must* consider the availability of other *stream water* sources but, *in its discretion,* may consider the availability of *groundwater* sources in determining the City's present and future need for stream water. The legislature's interpretation of § 105.12(2) [62] is consistent with the state's policy recognizing groundwater as a limited and dwindling supply which should not be depleted needlessly.[63]

Of course, an initial finding by the OWRB that allowing the appropriation would impair vested appropriative or riparian uses or prejudice future in-basin needs, as revealed by the last five-year study, makes the availability of other sources a moot issue. The OWRB must then deny the application regardless of whether the City has other available water sources. On the other hand, if there is surplus stream water available and if the City will apply it to a beneficial use, granting the appropriation may provide the applicant with the most economic water source and prevent the escape of surplus stream water into an adjacent state.[64]

■ Some, if not all, appellee-riparian owners have perfected appropriative rights in the same stream in which they are now claiming riparian rights. For almost 100 years, Oklahoma law has permitted riparian owners to "have their cake and eat it too". Under their riparian right riparian owners may assert a reasonable use any time and obtain a priority over pre-existing uses—both riparian and appropriative. Under the rubric of appropriative rights the riparian owners have a priority which can never be disestablished by later appropriations. We, therefore, hold that in the future a riparian owner who applies for an appropriation in stream water must be deemed to have voluntarily relinquished his riparian rights in that stream water, except for those preserved under the statute for domestic uses. Because of its significant constitutional implication, the principle of relinquishment we announce today shall be applied prospectively from the date mandate herein is issued.[65]

## F. RECALL OF THE APPROPRIATION

■ The final issue for our resolution is whether 82 O.S. § 105.12(4) requires the OWRB to grant an out-of-basin appropriation subject to recall (permanent divestment) by in-basin appropriators. This issue implicates both constitutional considerations and statutory interpretation. The maxim "first in time, first in right" [66] is a fundamental feature of the common-law appropriation doctrine codified at 82 O.S. 1981 § 105.2(B). The senior appropriator has priority over the junior appropriator when water supply is insufficient for all. In times of shortage the junior appropriator must stop diverting all or a portion of his appropriated amount until the supply again exceeds that required by senior appropriators. Though the appropriation is considered a vested property right and is not subject to permanent divestment except

**62.** Okl.Sess.L.1988, Ch. 203, § 3 (codified as 82 O.S.Supp.1988 § 105.12A(2)).

**63.** See *Oklahoma Water Resources Board v. Texas County Irr. and Water Resources Ass'n., Inc.,* Okl., 711 P.2d 38, 56 [1984] (Kauger, J., concurring).

**64.** See 82 O.S.1981 § 1086.1 A.(3) which declares Oklahoma's statutory policy that encourages the use of surplus stream water.

**65.** See *Harry R. Carlile Trust v. Cotton Petroleum,* Okl., 732 P.2d 438, 445–446 [1986].

**66.** *Qui prior est tempore, potior est jure.* See generally Weil, Waters: American Law and French Authority, *supra* note 26.

for nonuse,[67] that right is always subject to the rights of senior appropriators. The junior appropriator takes with notice of those prior rights. This state's appropriation statutes give the appropriator the right to bring suit when his right to use water is wrongfully impaired by another.[68] The OWRB may also institute legal proceedings to enjoin the wrongful diversion and file criminal complaints against the wrongdoers.[69] Under the statute, the only instance when an appropriator is subject to *permanent* divestment is for failure to beneficially use the water.[70]

In addition to this first-in-time, first-in-right limitation on all appropriations, the out-of-basin appropriator is faced with Oklahoma's statutory preference for in-basin use:

> Only excess and surplus water should be utilized outside of the areas of origin and citizens within the areas of origin have a prior right to water originating therein to the extent that it may be required for beneficial use therein; [71]

The OWRB is directed by 82 O.S.1981 § 105.12 [72] to review the needs within the area of origin every five years. Applicants within the stream system shall have all of the water required to supply their beneficial needs revealed by the study. The trial court held that, according to the statute's declared preference for in-basin use, all of the City's appropriation which is to be used outside the basin of origin (80%) is subject to recall by users within the basin of origin. Subsequently, the legislature clarified its declared preference for in-basin use and limited its sweep as follows: the preference applies only 1) when out-of-basin and in-basin applications for an appropriation are pending before the OWRB at the same time and 2) when future in-basin needs are revealed by the last five-year review made *prior* to the granting of an application.[73] The 1988 clarifying language expressly provides that the five-year review is not to be used to reduce a previously authorized appropriation.[74]

Therefore, in keeping with the most recent text of § 105.12(4) [75] and in keeping with the common-law prior appropriations doctrine, we reverse the ruling of the trial court and hold that any appropriation granted to the City on remand is to be treated as a vested right that is not subject to permanent divestment by subsequent in-

---

67. The Supreme Court of Nebraska held that a statute setting a maximum which could be appropriated for irrigation was unconstitutional insofar as it divested an appropriator of a vested right in a specific amount of water which had been previously applied to beneficial use. *Enterprise Irr. Dist. v. Willis*, 135 Neb. 827, 284 N.W. 326, 330 [1939].

68. 82 O.S.1981 § 105.5.

69. 82 O.S.1981 § 105.20.

70. 82 O.S.1981 § 105.17. To satisfy the requirements of due process of law, the statute provides for notice and hearing before the divestment can be effective. 82 O.S.1981 § 105.18.

71. 82 O.S.1981 § 1086.1.

72. *Supra* note 57.

73. Okl.Sess.L.1988, ch. 203 § 3. Pertinent amendments are in italics with deletions noted: "4. *B.* In the granting of water rights for the transportation of water for use outside the stream system wherein water originates, *pending applications to use water within such stream system shall first be considered in order to assure that* applicants within such stream system shall have a-right-to all of the water required to adequately supply the *their* beneficial needs-of-the-water-users therein *uses*. The Board shall review the needs within such area of origin every five (5) years *to determine whether the water supply is adequate for municipal, industrial, domestic, and other beneficial uses. C. The review conducted pursuant to subsection B of this section shall not be used to reduce the quantity of water authorized to be used pursuant to permits issued prior to such review. Such permits, however, remain subject to loss, in whole or in part, due to nonuse, forfeiture or abandonment, pursuant to this title.* ... if-so-determined, the-Board-shall-approve the-application-by-issuing-a-permit-to-appropriate-water. The-permit-shall-state-the-time within-which-the-water-shall-be-applied-to beneficial-use. In-the-absence-of-appeal-as provided-by-this-act,-the-decision-of-the-Board shall-be-final."

74. See text accompanying *supra* notes 59–61 (discussing the retroactive application of the 1988 clarifying language to the case at bar).

75. *Supra* note 72 (codified as 82 O.S. § 105.-12(B) and (C)).

basin appropriators. The latter appropriators take subject to temporary divestment by all prior appropriators, even those outside the basin of origin. Likewise, the City's appropriation is subject to temporary divestment by senior appropriators, in or out of the basin of origin, in times of shortage.

Notwithstanding the statutory rule that controls in-stream appropriators, all riparian owners enjoy a vested interest in the prospective reasonable use of the stream, which interest is not subject to prior appropriations. To the extent that § 105.12 fails to preserve that interest, we hold it violative of Art. 2, § 24, Okl. Const. Should a riparian owner assert a vested right to initiate a *reasonable* use of the stream *and* should the water in the stream be insufficient to supply that owner's reasonable use, we hold that the appropriator with the last priority must either release water into the stream sufficient to meet the riparian owner's reasonable use or stop diverting an amount sufficient to supply the riparian owner's reasonable use until there is water sufficient to satisfy both interests. This temporary divestment is similar to that required under the appropriation doctrine when a shortage of water impairs a senior appropriation. The described scenario should indeed be a rare occurrence, except perhaps in times of severe drought, if the OWRB conducts a thorough study of future in-basin needs every five years and denies all applications for appropriations which threaten those needs.

Nothing in today's pronouncement precludes the OWRB from granting, as authorized by 82 O.S.1981 § 105.13, seasonable permits allowing increased use and storage of stream water in times of heavy runoff during rainy seasons.

TRIAL COURT'S ORDER ON APPEAL FROM THE AGENCY IS AFFIRMED IN PART AND REVERSED IN PART; CAUSE REMANDED WITH DIRECTIONS.

HODGES, C.J., and ALMA WILSON, KAUGER and WATT, JJ., concur in the opinion by OPALA, J.

LAVENDER, V.C.J., concurs in part and dissents in part by opinion.

REIF, Special Justice, sitting by designation in lieu of SIMMS, J., who disqualified, concurs in part and dissents in part by opinion.

HARGRAVE, J., dissents by opinion.

SUMMERS, J., concurs in part and dissents in part.

HODGES, C.J., and OPALA, ALMA WILSON, KAUGER and WATT, JJ., concur in rehearing's denial.

LAVENDER, V.C.J., HARGRAVE and SUMMERS, JJ., and REIF, Special Justice, by designation in lieu of SIMMS, J., who disqualified, dissent from rehearing's denial.

LAVENDER, Vice Chief Justice, concurring in part; dissenting in part:

I must respectfully dissent from that part of the majority opinion holding the 1963 legislative amendments to our State's stream water law unconstitutional under the guise the amendments effected a taking of property without just compensation in violation of OKLA. CONST. art. 2, § 24. In reaching this result the majority makes several errors.

Initially, it misperceives that future, unquantified use of stream water by a riparian is a vested property right that can only be limited or modified pursuant to judicially mandated common law factors that were generally used to decide piecemeal litigation between competing riparians in water use disputes. Secondly, it misinterprets the plain and unambiguous legislation at issue and it fails to recognize that even assuming a vested property right is at issue, such rights in natural resources like water, may be subject to reasonable limitations or even forfeiture for failure to put the resource to beneficial use. Thirdly, its analysis of the law as to what constitutes a taking of private property requiring just compensation is flawed. In my view the

majority errs in such regard by failing to view the legislation as akin to zoning regulation, which although may limit a riparian's open-ended common law right to make use of the water to benefit his land and thereby effect the value of his land, does not deprive him of all economic use of his land or absolutely deprive him of water. The lack of water to a riparian, if it occurs, is caused by his own neglect or inaction by years of failure either to put the water to beneficial use or failure to gain an appropriation permit from the Oklahoma Water Resources Board (OWRB) for uses being made prior to passage of the 1963 amendments or uses made or sought to be made between passage of the amendments and the City of Ada's appropriation at issue here. This mistake of the majority is particularly egregious because it wholly ignores the virtually admitted fact that neither riparians or appropriators *own* the water they are being allowed to use. All of the people in this State own the water and that ownership interest by the legislation before us is merely being channeled by the Legislature, for the benefit of those owners (i.e. the people), to those uses deemed wise.

The majority has failed to consider persuasive case law from the highest courts of other jurisdictions upholding analogous legislation over similar attacks and pronouncements of the United States Supreme Court which lead me to conclude the legislation *on its face* is constitutional. The majority finally seems to confuse *public* fundamental and preeminent rights in the streams of this State, protected through the public trust doctrine, as being the private property of landowners (riparians) owning land adjacent to the stream waters in Oklahoma.

In place of the statutory scheme drafted by the Legislature after years of study and debate the majority acts as a super-legislature by rewriting the water law of this State in accord with its views of prudent public policy, something neither this Court or any court has the power to do.[1] The foundation of this judicial "legislation", relying as it does on the so-called California Doctrine, is illusory at best because the majority ignores pronouncements from the California Supreme Court which has itself recognized the common law doctrine of unquantified future riparian use of stream water is not a vested right, even in the face of a California constitutional provision specifically interpreted to protect it, *when it may impair the promotion of reasonable and beneficial uses of state waters and, in effect, constitute waste of the resource.*[2]

Instead of striking down the 1963 amendments I would hold the amendments to 60 O.S.1961, § 60 and the comprehensive stream water laws enacted contemporaneously therewith constitutional and that such laws did not facially constitute a taking of private property of riparian landowners without just compensation. I believe the legislation was enacted by the Legislature in the exercise of its police power and, at most, the amendments placed certain lawful limitations on the doctrine of riparian rights or simply defined what reasonable use consists of in the case of a riparian landowner.

In order to understand the erroneous nature of the majority opinion it is first necessary to understand the "property" right of riparians it purportedly protects and the central rationale given for holding the 1963 water law amendments unconstitutional. The "property" interest is supposedly the prospective or future reasonable use of stream water. The opinion posits that this unquantified *prospective or future use* is a

---

**1.** *See Toxic Waste Impact Group, Inc. v. Leavitt,* 755 P.2d 626, 630 (Okla.1988).

**2.** *In Re Waters of Long Valley Creek Stream System,* 25 Cal.3d 339, 158 Cal.Rptr. 350, 355, fn. 3, 599 P.2d 656, 661, f.n. 3 (1979). In said case the California Supreme Court said:

[A]ppellant also asserts that these common law cases disclose his future right to an unquantified amount of water has become "vested." The assertion is without merit. As dis-

cussed *post,* riparian rights are limited by the concept of reasonable and beneficial use, and they may not be exercised in a manner that is inconsistent with the policy declaration of article X, section 2 of the [California] Constitution. *Thus, to the extent that a future riparian right may impair the promotion of reasonable and beneficial uses of state waters, it is inapt to view it as vested.* (emphasis added)

vested right. Although the majority discusses preexisting water uses by riparians (i.e. uses initiated prior to passage of the 1963 amendments), as I read the opinion, it is the effect the legislation had on future use which is the basis for finding constitutional infirmity. In my view such future use was never a vested property interest inuring to the benefit of a riparian such that if it was changed or modified as accomplished by the 1963 stream water laws just compensation was due for a taking of property. Furthermore, even assuming future use could be considered a vested property interest under Oklahoma law prior to passage of the 1963 amendments the Legislature had the authority, without providing a mechanism for compensation, to provide that the unexercised "right" to use water at some unspecified time in the future could be limited to domestic use because continuous nonuse of water was determined by the Legislature to be wasteful and injurious to a comprehensive State plan regulating the beneficial use of such a valuable resource and, thus, subject to forfeiture or limited to those uses, in addition to domestic use, for which an appropriation was sought and granted by the OWRB.

Appellees have asserted in this case essentially two bases for their supposed property right. They assert this interest is to have some minimal flow (or the natural flow) in the stream system at issue or to be allowed, without compliance or regard to the statutory scheme, to initiate a non-domestic use of the water at some unspecified time in the future. The majority correctly determines that the natural flow arguments of Appellees are meritless under our case law, but then turns around and gives to riparians the opportunity to gain this minimal or natural flow under the auspices they have a protectible property right to make a reasonable use of the stream in the future. What the majority has failed to recognize is that the Legislature had the authority to modify or limit this common law doctrine without running afoul of the just compensation provision of our Constitution or the United States Constitution.[3] The majority also fails to understand the import of the reasonable use doctrine as it existed in Oklahoma prior to passage of the 1963 stream water law amendments and that the State for the benefit of all the people *owned* the waters at issue in this case and had plenary control over their disposition. In my view only preexisting uses (i.e. uses initiated prior to passage of the amendments and subject to validation thereunder) can be said to be property in any real or actual sense. *Such uses the majority admits were subject to validation under the 1963 amendments.* As to any common law claim to use an unquantified amount of water in the future such open-ended claim was lost or forfeited because it was determined to be wasteful by the Legislature and was properly limited to domestic use. Furthermore, riparians, just as other potential future water users, may obtain their future needs of water in addition to domestic use by applying for an appropriation under our water laws. If the water is not then available it is their own inaction or neglect which deprives them of water and not action of the State under the involved legislation. In effect, all the legislation at issue did was to put water users in this State on an equal footing (except for a statutory preference in favor of riparian domestic use) and provide a statewide *unitary* system for the acquisition of water rights. To further demonstrate the errors made by the majority I will next outline the history of water law in the Western United States and in Oklahoma specifically and then set forth a detailed analysis of the 1963 amendments.

Currently there are three major systems of water rights acquisition in the world. These are the riparian rights system, the prior appropriation system and the system of administrative disposition of water use rights.[4] The prior appropriation system in

---

3. The just compensation provision of the United States Constitution is found at U.S. CONST. amend. V. It applies to the actions of states through incorporation in U.S. CONST. amend. XIV.

4. L.A. TECLAFF, WATER LAW IN HISTORICAL PERSPECTIVE at 6 (1985). The administrative disposition system is handled in various ways throughout the globe. An over-view of

its present form is mainly managed as an appropriation-permit system and is, thus, in actuality a type of administrative disposition system.[5] This case is concerned with the riparian and appropriation-permit systems and their status in Oklahoma both historically and today.

The appropriation doctrine is prevalent in the Western United States and it is generally recognized its impetus in the region can be traced to the practices and customs of gold miners in California in the mid-nineteenth century.[6] In that there was little or no organized government in the early years of the California gold rush the miners implemented a system of water rights roughly parallel to rules utilized to govern acquisition and holding of mining claims.[7] The principle was based on priority of discovery and diligence in working the mining claim and consequently priority for one who began work to utilize the water in working the claim, assuming reasonable diligence in putting the water to actual use. Practically, the prevalence of the doctrine in the Western United States is due to the relative arid nature of the region and a desire to quantify water rights in the hopes of better controlling what has been thought to be scarce water resources.

A central feature of the doctrine is priority of right to the use of a definite amount of water.[8] Our early case law acknowledged the general law in this area as "first in time, first in right", in other words, the one first putting the water to use or who first began work to divert the water from a stream, assuming reasonable diligence in putting it to actual use, had a better right to the supply of water so used over subsequent in time users when shortage or insufficient supply existed.[9] It was not nec-essary that an appropriator own land adjacent to the stream.

The riparian doctrine has historically been characterized in two main ways. The majority correctly names these characterizations as the natural flow doctrine and the reasonable use doctrine. Generally, the natural flow doctrine was that each owner of land on a running stream had a right to the ordinary flow of the water running along or over his land and the water could be taken *only* for domestic purposes, e.g. for family use, livestock and gardening.[10] The doctrine is commonly referred to as the English rule and its primary focus is in maintaining the stream in its natural state. The doctrine was early modified by the reasonable use doctrine or American rule for the main reason it prohibited or severely restricted many uses to which a stream could be put, particularly heavily consumptive uses, such as irrigation. It also gave an unfair advantage to those at the mouths of streams because such landowners were practically the only ones that could utilize the water for other than domestic purposes.

The central theme of the reasonable use doctrine was that a riparian could make a reasonable use of the water for other than domestic purposes as long as the use did not injure another riparian owner.[11] *Neither under this theory or the natural flow doctrine was the landowner considered to own the water.* His rights in it were at most a usufructuary interest, in other words he had the right to use the water while it was passing over or next to his land.[12]

In Oklahoma both the appropriation and riparian doctrines were partially recognized

these various systems can be found in Chapter I of Teclaff's work.

**5.** *Id.*

**6.** 1 R. CLARK, WATER AND WATER RIGHTS § 15.1 at 60–61 (ed. 1967).

**7.** *Id.* at § 18.1(C), p. 77.

**8.** *Id.* at § 51.6–51.7, pp. 295–298.

**9.** *Gates v. Settlers' Milling, Canal & Reservoir Co.,* 19 Okl. 83, 91 P. 856, 858 (Okla.1907). In such case this Court proceeded to apply the general rule of law concerning prior appropriation doctrine in the Western states.

**10.** 1 R. CLARK, *supra* note 6, § 51.1 at 288–290; *See also Harris v. Brooks,* 225 Ark. 436, 283 S.W.2d 129, 132–133 (1955).

**11.** 1 R. CLARK, *supra* note 6, § 16.2 at 67–69.

**12.** *Id.* at § 16.1, pp. 66–67.

early in our development toward statehood. In 1890 the first Legislature of the Territory of Oklahoma enacted a provision adopted from the Dakota Territory dealing with the issue of water rights. The provision provided as follows:

The owner of the land owns water standing thereon, or flowing over or under its surface, *but not forming a definite stream. Water running in a definite stream, formed by nature over or under the surface, may be used by him as long as it remains there;* but he may not prevent the natural flow of the stream, or of the natural spring from which it commences its definite course, nor pursue nor pollute the same. (emphasis added) [13]

This provision remained unchanged through statehood until its modification by the 1963 amendments, particularly the changes embodied in 60 O.S.Supp.1963, § 60. As I view the provision it recognized by the emphasized portion that a riparian, although granted an ownership interest in water upon his land *not* forming a definite stream, *did not own any of the water forming a definite stream.* Consistent with the common law nature of the riparian doctrine the riparian's interest was recognized as usufructuary, *i.e. a right to use.*

The first legislative embodiment of the appropriation doctrine was passed in 1897 by the Territorial Legislature.[14] At such point in time present day Oklahoma was essentially divided into two halves, a western part, Oklahoma Territory and an eastern part, Indian Territory.[15] The 1897 law allowed for appropriation of the ordinary flow or under flow of every running stream, flowing river and the storm or rain waters thereof within those portions of Oklahoma Territory wherein irrigation could be beneficially utilized. These waters were declared in the first section of the statutory scheme *to be the property of the public.* Protection was afforded to riparians to the extent such flows were not to be diverted without the consent of the riparian owner, except by condemnation as provided in the statutory scheme.[16] The legislation further provided that even after an appropriation was granted the riparian owner could still use the water for domestic purposes.[17]

A more comprehensive pre-statehood statutory scheme was passed in 1905 and the provision protecting the riparian right to the ordinary flow of any stream was not contained in the legislation.[18] By this legislation the Territorial Legislature recognized that "[b]eneficial use shall be the basis, the measure, and the limit of the right to the use of water...." [19] As I view this early pre-statehood legislation the most important principle espoused therein is it recognized, consistent with the general doctrine in the Western States, that *beneficial use would be the overriding factor in determining who had the right to the use of the water.*

The next legislation in relation to appropriation was promulgated in 1908 and it was the first passed by the State Legislature to be effective in all of Oklahoma, in other words what had formerly been divided into Indian and Oklahoma Territories.[20]

13. Terr.Okla.Stat. § 4162 (1890).

14. Sess.Laws of Okla.Terr., Ch. 19, Art. I, §§ 1–21, pp. 187–195 (1897).

15. For the exact boundaries of the Oklahoma Territory and Indian Territory refer to 26 U.S.Stat. at Large, Ch. 182, § 1 (Oklahoma Territory) and 26 U.S.Stat. at Large, Ch. 182, § 29 (Indian Territory). Oklahoma Territory had been carved out of what had previously been a part of Indian Territory by the Organic Act of 1890, 26 U.S. Stat. at Large, §§ 1–44. Appellees land is in a portion of Oklahoma that was still Indian Territory at the time of passage of the 1897 appropriation statute.

16. Sess.Laws of Okla.Terr., Ch. 19, Art. I, § 2, pg. 188.

17. *Id.* at § 10, pp. 190–191.

18. Sess.Laws of Okla.Terr., Ch. 21, Art. I, §§ 1–56, pp. 274–301 (1905).

19. *Id.* at § 1, pg. 275.

20. Okla.Gen.Stat., Ch. 37, §§ 3455–3516 (1908). The 1905 Territorial act would have been in force immediately after statehood in the entirety of the State (Oklahoma became a state on November 16, 1907 by Proclamation of Statehood executed by President Theodore

The legislation, like its 1905 counterpart, recognized the overriding principle that beneficial use would be the overriding factor in who had the right to use water. In 1909 another provision concerning appropriation was passed which was a mixture of the 1897 and 1905 schemes.[21] The 1910 Revised Laws of Oklahoma contain provisions only of the 1905 territorial scheme.[22] In 1925 the Legislature promulgated a provision recognizing the priority of all beneficial uses of water which had been initiated prior to statehood and, again, that beneficial use would be the basis, the measure, and the limit to the use of water.[23]

In addition to the legislative embodiments of water law outlined above this Court has decided numerous cases between riparian landowners or those claiming under them. Although as noted the majority correctly posits that this Court recognized the reasonable use doctrine in deciding these cases, rather than the natural flow doctrine as argued by Appellees, the majority fails to recognize the true effect of these decisions. Rather than exhibiting some protection for an open-ended "right" to make a use of an unquantified amount of water at an unspecified time in the future, it is my view the cases when viewed in proper perspective only stand for the proposition that a riparian, as against a competing riparian, had to show some material or substantial impairment of his own right *to use water* or imminent threat to such right before the judicial machinery would supply relief for any interference. In other words, only interference with use

of the water would entitle the riparian to judicial intervention and protection was never afforded for any future or prospective use upon which the majority bases its constitutional decision.[24]

Other cases such as *Markwardt v. City of Guthrie*,[25] protected a lower riparian owner when a city used a waterway to discharge its sewage therein. *Markwardt* allowed recovery for damages in a nuisance action against the city when pollution caused the water *to be unusable*. The plaintiff in said case had diverted water from the stream to build a reservoir which was used to water livestock and irrigate crops. The reservoir also had an abundance of fish. The plaintiff sold butter, milk, vegetables and fish, all a result of water used from the reservoir which had been diverted from the stream. In yet other cases a riparian owner was allowed to recover damages when *his land or crops* were damaged by a lower riparian owner damming up a water course and thereby throwing the water in excessive amounts upon the lands of an upper riparian.[26] There is also the case of *Atchison, T. & S. F. Ry. Co. v. Hadley*,[27] purportedly relied on by the majority as a case exhibiting Oklahoma's long recognized common law riparian right as a private property right, which allowed an action for damages when approximately fourteen acres of plaintiff's *land* had been washed away by water thrown upon the land as a result of defendant railroad building an embankment which changed the channel and flow of the South Canadian river.

Roosevelt) prior to the passage of the 1908 legislation by virtue of the last provision of § 13 of the Enabling Act of 1906, 34 U.S.Stat. at Large, Ch. 3335 §§ 1–22, which provided that the laws in effect in Oklahoma Territory would extend over the entire State, until changed by the Legislature.

21. Comp.Laws Okla., Ch. 54, §§ 3915–3982 (1909).

22. Rev.Laws.Okla.Ann., Vol. I, Ch. 40, §§ 3636–3688 (1910).

23. Sess.Laws of Okla., Ch. 76, § 1 (1925).

24. *See Smith v. Stanolind Oil & Gas Co.*, 197 Okl. 499, 172 P.2d 1002 (1946) (lessee of riparian owner allowed to take water from a stream

and diminish its flow as long as the water left was sufficient for a lower riparian's domestic use and for approximately 45 head of cattle); *Baker v. Ellis*, 292 P.2d 1037 (Okla.1956) (permanent injunction upheld against defendant's construction of a dam which threatened the supply of water to a downstream riparian owner who utilized the water for stock purposes).

25. 18 Okl. 32, 90 P. 26 (Okla.1907).

26. *Miller v. Marriott*, 48 Okl. 179, 149 P. 1164 (1915).

27. 168 Okl. 588, 35 P.2d 463 (1934).

What is seen by these cases is that under the common law of Oklahoma the right we were protecting was the right of a riparian landowner to use the water for various beneficial purposes which he was making of the stream *or* the right of the riparian owner to have his land or use of that land (e.g. crops) protected from interference by a misuse or excessive use of the water course by another. I do not read them as elevating to the status of vested property right the ability of a riparian to make a use of some unquantified amount of water at some unspecified time in the future, which could never be limited or restricted (or abrogated as wrongly asserted by the majority) by the Legislature and I think the majority is wrong in so concluding. It must next be determined what the legislation did in regard to a riparian owner to see whether the legislation on its face took anything away from them for which compensation must be paid.

The legislation at issue had as its goal the accomplishment of one central purpose. *That purpose was to provide a statewide unitary scheme for the acquisition of water rights.*[28] The scheme chosen by the legislature was generally along the lines of the prior appropriation system, but it did not simply ignore the fate of those who had been entitled to use water as riparians, as will be shown.

Riparians, as noted previously herein and in the majority opinion, were given a statutory preference to use water from a stream for domestic purposes. These purposes could include general household purposes, for farm and domestic animals up to the normal grazing capacity of the land and for the irrigation of land not exceeding three acres for the watering of gardens, orchards and lawns. It was also provided that water could be stored for such purposes in an amount not to exceed two years supply.[29] A detailed scheme was also contained in the legislation setting forth priorities based on time of initiation of usage.[30] Preexisting beneficial uses, *both those of a riparian and appropriator,* were subject to protection. The majority admits the legislation so provided. Any water claimant was given a minimum of one year to establish their priority, and such time limit in the discretion of the OWRB could be extended.[31]

An elaborate procedure was set forth mandating that the OWRB conduct surveys, collect data, and gather information to make determinations of all persons using water throughout the State so that such persons could participate in public hearings to determine priorities and rights to the beneficial use of water.[32] Notification of any hearing date by certified or registered mail was required to those persons determined by the OWRB as being users of water.[33] Publication notice in a newspaper of general circulation in each county of the stream system for which rights were to be determined was required for anyone else who might claim the right to use water or might otherwise be interested in the matter.[34] Prior uses, when determined and recognized by the OWRB, were effectively turned into valid appropriations. A right to appeal any decision of the OWRB to a state district court was afforded, with an ultimate appeal to this

28. A detailed analysis of the legislative history behind the comprehensive stream water law amendments of 1963 is found in two law review articles. Rarick, Oklahoma Water Law, Stream and Surface in the Pre–1963 Period, 22 Okla. L.Rev. 1 (1969); Rarick, Oklahoma Water Law, Stream and Surface Under the 1963 Amendments, 23 Okla.L.Rev. 19 (1970). These articles show that all water users in the State were represented in the process leading up to passage of the legislation, including riparians and nonriparians alike.

29. 82 O.S.Supp.1963, § 1–A(a). Domestic use definitions are now found at 82 O.S.1981, § 105.1(B).

30. 82 O.S.Supp.1963, § 1–A(b)(1)–(7) and (c). The priorities are now set forth at 82 O.S.Supp. 1988, § 105.2.

31. 1963 Okla.Sess.Laws, Ch. 205, § 4, pg. 269.

32. 82 O.S.Supp.1963, § 6.

33. *Id.*

34. *Id.*

Court.[35] Any potential water user who sought to initiate a use after passage of the legislation, riparian or not, was required to apply to the OWRB for a permit prior to use.

Certain things are undeniably clear from this legislation. By the amendments the previously existing open-ended and unexercised common law "right" to reasonable future use espoused by the majority concerning riparian water rights was limited to a right of domestic use. Further, all waters entering a definite stream were subject to appropriation, not riparian water uses under the common law doctrine. For riparians then possessing and exercising an existing riparian water right (i.e. the riparian was actually using the water reasonably or beneficially) the amendments provided a mechanism for the recognition, protection and continued validity of such uses and turned those existing uses into valid appropriations. Finally, riparians could gain a right to use water in the future by a grant of an appropriation from the OWRB. All that was actually lost to riparians was the open-ended, unused or unexercised entitlement under the common law factors enunciated by the majority opinion. I differ from the majority because I see no facial constitutional infirmity in these changes accomplished by the 1963 amendments as it does.

The United States Supreme Court has noted on a number of occasions that a state may abandon the common law doctrine of riparian rights in favor of an appropriation system. In the case of *United States v. Rio Grande*[36] it stated, "[A]s to every stream within its dominion a State may change this common law rule and permit the appropriation of the flowing waters for such purposes as it deems wise." Cases

such as *Rio Grande* point out the plenary authority a state has over the streams and rivers within its borders like those at issue in this case. This Court itself has recognized the plenary power of the State of Oklahoma in a case mistakenly relied on by the majority in support of its just compensation position here. In *Oklahoma Water Resources Board v. Central Master Conservancy District*[37] we stated, "[t]he state is without authority to transfer one man's property to another, but its power to control unappropriated public waters is plenary. Definite nonnavigable streams are public waters. The state may either reserve to itself or grant to others its right to utilize these streams for beneficial purposes." We also recognized there that a riparian had absolutely no ownership interest in the water forming a definite stream.[38]

In yet another United States Supreme Court case the public right in the waters of a state were deemed paramount over the just compensation arguments of a New Jersey riparian owner who sought to take water from the Passaic River and sell it to New York. The Supreme Court stated:

[I]t appears to us few public interests are more obvious, indisputable and independent of particular theory than the interest of the public of a State to maintain the rivers that are wholly within it substantially undiminished, *except by such drafts upon them as the guardian of the public welfare may permit for the purpose of turning them to a more perfect use. This public interest is omnipresent wherever there is a State, and grows more pressing as population grows. It is fundamental, and we are of opinion that the private property of riparian proprietors cannot be sup-*

**35.** 82 O.S.Supp.1963, § 5.

**36.** 174 U.S. 690, 702–703, 19 S.Ct. 770, 774–775, 43 L.Ed. 1136 (1899); *See also Kansas v. Colorado,* 206 U.S. 46, 94, 27 S.Ct. 655, 666, 51 L.Ed. 956 (1907); *California v. United States,* 438 U.S. 645, 662–663, 98 S.Ct. 2985, 2994–2995, 57 L.Ed.2d 1018 (1977).

**37.** 464 P.2d 748, 753 (Okla.1968). We also recognized in *Curry v. Hill,* 460 P.2d 933 (Okla.1969) that although a riparian may own

the river bed of a generally thought of nonnavigable river which is navigable in fact, his ownership of the river bed grants him no exclusive fishing rights in the river, but the public has a right to use the waterway as a public highway and may fish therein, as long as they do not trespass on the land of the riparian. *Id.* at 933–934.

**38.** 464 P.2d at 754, *supra* note 37.

*posed to have deeper roots.* (emphasis added) [39]

With these cases in mind what vested property interest did the 1963 amendments take from riparians? The majority says the ability to demand a reasonable use of the stream in the future (unencumbered by compliance with our State's water laws) under common law or judicially imposed factors that courts over the years had utilized to decide piecemeal disputes involving riparians or their privies. In essence, the majority indicates it relies on the so-called California Doctrine for its position. It, however, nowhere discusses recent authority from California that sheds serious doubt on its analysis. In the case of *In Re Waters of Long Valley Creek Stream System* [40] the California Supreme Court was not so generous. There it held that the state, through its water board, *may subordinate any future unexercised riparian right below any appropriation awarded prior to user by the riparian when conducting stream wide adjudications because doing so will promote the state's interest in fostering the most reasonable and beneficial uses of scarce water resources.* [41] This view was recently reaffirmed in a unanimous decision by the California Supreme Court. [42] In my view our Legislature has accomplished nothing more than that approved by the California Supreme Court via the legislation at issue here and its limitations and modifications in regard to the common law reasonable use doctrine.

The majority also relies on the United States Supreme Court case of *United States v. Gerlach Livestock Co.* [43] to support its view that the common law reasonable use doctrine is constitutionally protected. Its reliance on this case is misplaced. In the first instance, *Gerlach* relied on a federal statutory scheme (the Reclamation Act of 1902, 43 U.S.C. § 371 et seq.) as its basis for holding compensation was required to be paid to riparian landowners which were benefited from the seasonal overflows of the San Joaquin River when the construction of the Friant Dam would cause the loss of this seasonable overflow *that the landowners had been utilizing upon their grasslands.* Secondly, California had a constitutional provision protecting riparian rights to water *and* the Supreme Court determined under California law *the use* of the waters on riparian grassland to enhance its productivity was a private right. [44] Again, the right protected, even in such case, was an existing use of the water in the stream.

In the instant case the majority does not rely for its holding of constitutional infirmity on the loss of any preexisting uses riparians were making of the stream prior to passage of the 1963 amendments. It realizes it cannot do so in this facial attack upon the legislation because the amendments provided a mechanism for protection of these uses. Instead it says riparians have a right to insist that things remain as they were under the common law in regard to future use. Other states have concluded differently.

The South Dakota Supreme Court in the case of *Belle Fourche Irrigation District v. Smiley* [45] rejected a similar argument to that raised by Appellees here and approved

**39.** *Hudson County Water Co. v. McCarter,* 209 U.S. 349, 356, 28 S.Ct. 529, 531, 52 L.Ed. 828 (1908); *See also* Trelease, Coordination of Riparian and Appropriative Rights to the Use of Water, 33 Texas L.Rev. 24, 66–67 (1954).

**40.** 25 Cal.3d 339, 158 Cal.Rptr. 350, 599 P.2d 656 (1979), *supra* note 2.

**41.** *Id.* at 668–669.

**42.** *In Re Water of Hallet Creek Stream System,* 44 Cal.3d 448, 243 Cal.Rptr. 887, 899–901, 749 P.2d 324, 336–338 (1988), *cert. denied,* 488 U.S. 824, 109 S.Ct. 71, 102 L.Ed.2d 48 (1988).

**43.** 339 U.S. 725, 70 S.Ct. 955, 94 L.Ed. 1231 (1950).

**44.** *Id.* at 742–755, 70 S.Ct. at 964–971. It is interesting to note that Justice Douglas, concurring in part and dissenting in part, sought to emphasize that the water rights involved were not protected under U.S. Const. amend. V, but that only the Reclamation Act of 1902 required payment by its terms. *Id.* at 762, 70 S.Ct. at 974.

**45.** 84 S.D. 701, 176 N.W.2d 239 (1970) *after remand* 87 S.D. 151, 204 N.W.2d 105 (1973).

of by the majority. Said case involved a challenge to that state's comprehensive state water law of 1955 by a riparian owner who asserted he had a vested right to use or divert water from the Belle Fourche River for domestic and irrigation purposes by virtue of his ownership of land contiguous to the river. The riparian claimed that this right became an inseparable incident of his land when it was settled, that use did not create it and disuse could not destroy it, and to deny him said right deprived him of property without just compensation.[46] In rejecting the argument the South Dakota Supreme Court effectively determined that the legislature had the authority to define a vested right in water as that being utilized for beneficial purposes prior to passage of its state water law and that the Legislature of South Dakota could limit the rights of riparians to domestic use or to those uses granted by appropriation under their statutory scheme.[47]

Another court upholding legislation of a similar nature was the Texas Supreme Court in *In re Adjudication of the Water Rights of the Upper Guadalupe Segment of the Guadalupe River Basin*.[48] In pertinent part the legislation at issue in the Texas case provided that water claims would only be recognized to the extent of the maximum actual application of water to beneficial use without waste during any calendar year from 1963 to 1967.[49] The legislation had been passed in 1967 to clear up the confusion and chaotic nature of the water law in Texas, which like Oklahoma had in place a dual system recognizing both the riparian and appropriation doctrines.[50] Even though, as distinguished from the *Belle Fourche* case, the Texas court acknowledged that riparians who acquired their land before a certain date had a vest-

ed right to the use of non-flood waters, the court still upheld the legislation at issue in part because it recognized that what the riparians had was only a right to use what the state owned, i.e. the water.[51] The court determined that such a right, like the appropriator's right, was a right to use the resource beneficially, not to waste it.[52]

The court further relied on *Texaco, Inc. v. Short*,[53] where the United States Supreme Court upheld the Indiana Dormant Mineral Act which provided that severed mineral interests not used for a period of twenty years automatically lapsed and reverted to the current surface owner, unless certain procedural steps were taken. In said case the Supreme Court stated:

> We have concluded that the State may treat a mineral interest that has not been used for twenty years and for which no statement of claim has been filed as abandoned; it follows that, after abandonment, the former owner retains no interest for which he may claim compensation. It is the owner's failure to make any use of the property—and not action of the State—that causes the lapse of the property right; there is no "taking" that requires compensation. The requirement that an owner of a property interest that has not been used for twenty years must come forward and file a current statement of claim is not itself a "taking".[54]

Thus, even if it be assumed the majority is correct that the riparian had a protectible property interest to some unquantified right to make use of the water at some unspecified time in the future, this common law right could be lost or forfeited by nonuse or, at least, limited to domestic use and appropriative uses granted by the OWRB as sought to be accomplished by the legis-

**46.** 204 N.W.2d at 107.

**47.** *Id.* at 107.

**48.** 642 S.W.2d 438 (Tex.1982).

**49.** *Id.* at 442.

**50.** A discussion of the history of Texas water law is contained at pp. 439–442 of the Texas Supreme Court opinion.

**51.** *Id.* at 444.

**52.** *Id.* at 445.

**53.** 454 U.S. 516, 102 S.Ct. 781, 70 L.Ed.2d 738 (1982).

**54.** *Id.* at 530, 102 S.Ct. at 792.

lation under review.[55] To rule otherwise simply places a common law doctrine as an impenetrable barrier to efficient management of a natural resource never deemed to be owned by private landowners.

The majority further appears to say in part that the legislation on its face is unconstitutional because it did not provide express notice that a riparian would be limited in the future to domestic use and additional future uses only where an appropriation was sought and granted by the OWRB. The position of the majority in such regard is simply untenable under the clear language of the 1963 legislation. First off, Section 1 of the 1963 legislation (60 O.S.Supp.1963, § 60) and Section 2 (82 O.S.Supp.1963, § 1–A) unequivocally limited the riparian to domestic use in express terms. Section 60 provided in relevant part as follows:

*Water running in a definite stream, formed by nature over or under the surface, may be used by [the riparian] for domestic purposes as defined in [82 O.S.Supp.1963, § 1–A], as long as it remains there, but he may not prevent the natural flow of the stream, or of the natural spring from which it commences its definite course, nor pursue nor pollute the same, as such water then becomes public water and is subject to appropriation for the benefit and welfare of the people of the State....* (emphasis added)

Next § 1–A(a) set forth in pertinent part: *Beneficial use shall be the basis, the measure and the limit of the right to*

*the use of water; provided, that domestic use shall not be subject to the provisions of this Title.* (emphasis added)

Immediately following § 1–A(a) was subsection 1–A(b) which provided in part as follows:

*Priority in time shall give the better right. From and after the effective date of this Act, the following priorities and no others shall exist:* .... (emphasis added)

Finally, 82 O.S.Supp.1963, § 21 informed potential future water users that all such persons would have to obtain a permit for an appropriation from the OWRB before using water from a stream. Section 21 provided in pertinent part:

Any person, firm, corporation, State or Federal Governmental Agency or subdivision thereof, intending to acquire the right to the beneficial use of water, shall, before commencing any construction for such purposes, or before taking the same from any constructed works, make an application to the [OWRB] for a permit to appropriate in the form required by the rules and regulations established by the [Board].

It is beyond question these provisions expressly notified riparians future use would be limited to domestic use and any future use beyond this would be limited to those uses for which a permit was sought and granted by the OWRB. The decision of the majority in ruling otherwise simply ignores the express language of the legislation before us.

---

**55.** Other cases supportive of my position are *State v. Knapp,* 167 Kan. 546, 207 P.2d 440 (1949); *In Re Hood River,* 114 Or. 112, 227 P. 1065 (1924), *appeal dismissed* 273 U.S. 647, 47 S.Ct. 245, 71 L.Ed. 821 (1926); and *In Re Deadman Creek Drainage Basin,* 103 Wash.2d 686, 694 P.2d 1071 (1985). *See also Village of Tequesta v. Jupiter Inlet Corporation,* 371 So.2d 663 (Fla.1979) *cert. denied* 444 U.S. 965, 100 S.Ct. 453, 62 L.Ed.2d 377 (1979). In said case the Florida Supreme Court rejected a taking argument in regard to underground water by determining under Florida law that landowners only had a usufructuary interest in such water, rather than any ownership interest. As such the court ruled the interest could not be characterized as private property. It also specifically rejected the argument that a right of user was itself private property requiring condemnation, unless the overlying land had been rendered useless by a diversion of the water by a city government. The court further determined that there was no necessity for its state water act to provide for condemnation of any unexercised common law right to use water. Other cases upholding groundwater legislation are found in Kansas and South Dakota. *See Knight v. Grimes,* 80 S.D. 517, 127 N.W.2d 708 (1964); *F. Arthur Stone & Sons v. Gibson,* 230 Kan. 224, 630 P.2d 1164 (1981). I express no view on how I would treat legislation concerning underground percolating water not forming a definite stream as such is not before us at this time.

Any uses then that the majority says must be subject to the common law doctrine of reasonable use (e.g. recreation, fighting grass fires and use to water livestock) and the judicially imposed balancing of factors should have been the subject of an application for an appropriation before the OWRB. If the riparians claiming such use would have filed an application for these uses at any time prior to the City's requested appropriation these uses would presumably have been protected. Further, if some or all of them were uses preexisting passage of the legislation the legislation on its face, as the majority admits, provided a mechanism to validate the uses as appropriations.[56] Thus, in my view the language gave express notice that future use of water would be limited to riparian domestic use and appropriations granted by the OWRB.

The majority further fails in its analysis in the area of just compensation law. It relies on the case of *Frost v. Ponca City*[57] which ruled although a city may exercise its police power to restrict a landowner's right to capture hydrocarbons underlying his property in the interest of health and safety, if a city (or a public entity) itself removes the hydrocarbons and sells them the private landowner must be compensated. The majority fails to see at least two significant distinguishing factors between the situation involved in *Frost* and that facing us today. One, *Frost* relied on the fact hydrocarbons, such as oil and gas underlying a landowner's property, were subject to the law of capture, i.e. the landowner had the exclusive right to drill for, produce, or otherwise gain possession of such substances and when reduced to actual possession, the landowner obtained an abso-

lute ownership interest in the substance.[58] After the ownership interest was established the landowner could sell the hydrocarbons. *Riparians were never deemed to have such exclusive rights in regard to stream water as shown above and the majority admits this.*

Secondly, in *Frost* the landowners were *totally restricted from removing the hydrocarbons themselves or reducing them to actual possession under the law of capture. Here Appellee riparians are not totally restricted from gaining the use of stream water in the future.* The only requirement is that they apply for an appropriation permit. Of course they also may use the water for domestic purposes without a permit and the legislation provided an opportunity to protect preexisting uses. No State or public law prohibits their use of stream water, but only inaction on their part. In view of these differences it is inapposite for the majority to rely on *Frost.*

Instead of placing unwarranted reliance on *Frost* to strike down the legislation under review I would uphold it by ruling it is akin to zoning regulations which have long been upheld by the courts.

When one properly determines riparians have no property right to insist that the law remain as it was under the common law the attack on the amendments is nothing more than a facial assault that the amendments have an adverse impact on riparian land values and detrimentally effect the ability of riparians to use stream water in connection with their land. ·I believe such attack is without merit, although it does point out it is *use of the water upon the land or, at least, in relation to the*

**56.** Appellees *do not* raise a constitutional lack of notice argument in regard to their ability to validate any preexisting uses and establish priority therefore under the 1963 legislation. There is, thus, no occasion for us to decide any such issue here. It is worth noting, however, that we have not been hesitant to find a lack of notice in a stream system adjudication process under the 1963 legislation when the facts so warranted. *Talley v. Carley,* 551 P.2d 248 (Okla.1976) (Priority of riparian appropriators deemed a nullity when OWRB failed to take adequate steps to ascertain the last known ad-

dress of the involved parties). It is also worth noting, contrary to the view of the majority, that *Talley* was a specific acknowledgement by this Court that the 1963 water law amendments *expressly unitized* the water law of this State under the appropriation doctrine and that to protect a future use of water an appropriation would have to be granted by the OWRB.

**57.** 541 P.2d 1321 (Okla.1975).

**58.** *Id.* at 1323.

*land that is the property interest potentially affected.* In my view, when the constitutional attack is analyzed in proper perspective the just compensation challenge must fail in regard to any facial attack on the legislation.

The United States Supreme Court has long recognized that land use regulations normally do not effect a taking of property as long as the regulations at issue substantially advance legitimate state interests and do not deny a landowner economically viable use of his land.[59] Noone argues here, including the majority, that the statutory scheme under review does not substantially advance legitimate state interests. The State interests advanced are numerous. Among them are direct promotion of the efficient management of our State's water resources by preventing waste. It provides a semblance of certainty in the area of water rights and distributes this valuable resource *which is owned by all the public* in response to demonstrated need. Therefore, the only real question in the taking context is whether the legislation has deprived riparians of the economically

viable use of their land. I do not think it has nor from my review of the record herein do I read Appellees submissions to assert otherwise.

Nowhere is there evidence in this record that the legislation itself has rendered the use of riparian land economically unviable. Riparians are not estopped from using their land for any purpose or gaining water rights in connection therewith as specified above. The most that could be said from this record is that Appellees argue that *if* the City is granted the appropriation at issue the entire stream system will be dried up below the point of diversion on Byrds Mill Spring. Even if such were the case, which it is not,[60] this alone would not render the legislation facially invalid under either the Oklahoma Constitution (as the majority rules) or United States Constitution just compensation clauses. If valid at all such an argument would be an as applied attack which would have to be brought via an inverse condemnation proceeding, rather than from an OWRB administrative order.[61] Such an as applied

**59.** *Agins v. Tiburon,* 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106 (1980). We have recognized the proper test in land use/just compensation situations in the recent case of *April v. City of Broken Arrow,* 775 P.2d 1347 (Okla.1989). The United States Supreme Court has upheld land use regulations even in the face of arguments that a drastic diminution in land value has occurred by virtue of the regulations. *See e.g. Penn Central Transportation Co. v. New York City,* 438 U.S. 104, 131, 98 S.Ct. 2646, 2663, 57 L.Ed.2d 631 (1978) and *Euclid v. Ambler Realty Co.,* 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926). In my view, such cases dispose of any argument that mere diminishment in riparian land value by virtue of the limitation of riparian water use to domestic use and uses granted by appropriation permit entitles a riparian to compensation for a taking of property.

**60.** The evidence before the OWRB appeared to show the appropriation at issue would not, as Appellees assert, have the effect of drying up the stream system. In fact, the evidence was that the average annual runoff from rain water for all of the Clear Boggy Basin down to the point where Buck Creek and Clear Boggy Creek intersect was 59,851 acre-feet of water per year. The minimum runoff was calculated to be 23,866 acre-feet of water per year. These figures did not include any flow coming from Byrds Mill Spring and the expert witness for the City was

of the opinion the amount of runoff alone would be sufficient to meet all prior existing water rights in the entire watershed, i.e. in the entire upper Clear Boggy System. From my review of the record it is only in extreme drought situations that diversion of the flow from Byrds Mill spring might have the effect of providing less water than needed.

**61.** Inverse condemnation has been aptly distinguished from a proceeding in eminent domain by the United States Supreme Court in *Agins v. Tiburon, supra* note 59. There it said:

Inverse condemnation should be distinguished from eminent domain. Eminent domain refers to a legal proceeding in which a government asserts its authority to condemn property. [ ] Inverse condemnation is "a shorthand description of the manner in which a landowner recovers just compensation for a taking of his property when condemnation proceedings have not been instituted." (citations omitted) Id., 447 U.S. at 258, f.n. 2 [100 S.Ct. at 2140, f.n. 2.]

This Court has recognized the potential viability of an inverse condemnation recovery when a landowner's property was flooded by the effect of certain municipal flood plain ordinances and a city's alleged inadequate maintenance of drainage channels. *Mattoon v. City of Norman,* 617 P.2d 1347 (Okla.1980). We also recognized in *April v. City of Broken Arrow, supra* note 59,

attack is not before us at this time and we, thus, have no occasion to reach the issue. However, if it was properly before us, in my view, in the normal situation it would not be application of the legislation which could be said to have rendered use of the land economically unviable (if such were adequately proven), but the failure of riparians to gain an appropriation permit under the Act, i.e. the failure of riparians to use the water beneficially or to protect any preexisting uses. In sum, I would hold the legislation on its face did not constitute a taking of private property for which compensation is required just as land use regulation does not constitute a taking of private property when the owner is not denied economically viable use of his land.

Although not discussed in great detail by the majority I am of the further opinion that the majority confuses certain public rights in our streams as being exclusive private property rights of riparians. I come to this conclusion because of the majority's assertion that, if under its common law balancing test protection of wildlife is deemed a reasonable use of the stream and the City or other public entity wants water which will detrimentally affect wildlife, riparians must be compensated for this loss of wildlife.[62] Wildlife *is not* the private property of riparians or any other landowner. Oklahoma law specifically indicates that "[a]ll wildlife found in this state is the property of the state." 29 O.S.1981, § 7-204. *See also Collopy v. Wildlife Commission,* 625 P.2d 994 (Colo.1981). Thus, I do not believe riparians have any right to demand compensation for loss of wildlife which *in no sense is deemed to be their private property.* The mistake of the majority does, however, point up an evolving

doctrine in the area of the law known as the public trust doctrine which I will briefly discuss.

Generally the public trust doctrine is a recognition that it is all of the people and not a select few, such as riparians or appropriators, that have the paramount interest in public waters like those at issue in this case. The public interests protected are numerous and seemingly expanding.[63] The doctrine has been interpreted to protect navigation, fish and wildlife habitat, aquatic life, recreation, aesthetic and scenic beauty.[64] Obviously, the preservation of such interests require that certain minimum flows be maintained in watercourses so that these public interests are protected. This does not, however, mean that if the minimum flows are not maintained any private property interest of riparians has automatically been taken because, in my view, these interests generally are held by the public at large and not by a few select landowners and it does not necessarily mean riparians have been denied economically viable use of any land.

What the doctrine means, however, at a minimum is that grants of water rights in our streams and rivers, absent express or sufficiently clear legislative intent to the contrary, comes burdened with these public interests. In other words, the public interests are paramount to both riparian and appropriative interests and may be limited by proper legislation aimed at protecting these *paramount public interests.*

As to the majority's treatment of the other issues involved in this case (consideration of groundwater in the appropriation application process and the recall issue) I concur therein except to the extent the

---

the distinction between a facial attack on land use regulation in regard to whether a taking of property has occurred and one where particular actions taken under the legislation are applied in such a manner that constitute a taking, even though the legislation is facially constitutional.

**62.** In footnote 53 of the majority opinion the trial court is directed, in determining whether the riparian owners' use of water is reasonable, to consider that *uncaptured* wildlife is the property of the State. I, therefore, assume the majority still leaves open the possibility protection

of *uncaptured wildlife by riparians* may, under certain unspecified circumstances, be deemed a reasonable use and if an appropriation will interfere with said use *compensation must be paid to the riparian* even though the wildlife is not the property of the riparian, but is deemed to be public property.

**63.** Johnson, Water Pollution and the Public Trust Doctrine, 19 Environmental Law 485 (1989).

**64.** *Id.*

views expressed by the majority on said issues are inconsistent with the views expressed above. Finally, I would remand the matter to the OWRB because from my review of the record the OWRB did not properly consider the needs of downstream domestic users and prior appropriators as it was statutorily required to do.

HARGRAVE, J., and REIF, Special Justice, have joined in the views herein expressed.

REIF, Special Justice, concurring in part and dissenting in part:

I wish to state that I join the views expressed by Justice Lavender. In writing separately, I do not propose to improve upon his analysis and conclusions. Rather, I offer this brief statement because I once held the general viewpoint of the majority opinion that a riparian has a vested right to initiate *any* reasonable use at *any* time.

Admittedly, the hallmark of riparian law has been the settling of controversies caused by *new* uses conflicting with established uses. The courts were called upon to weigh the competing interests (and others that may be affected) and determine or define what constituted a reasonable use at a given point in time. Established uses had to accommodate and sometimes yield to new ones, because the law treated "the right" of riparians to the use of the waters of a stream as a qualified and not an absolute right of property. *Martin v. British American Oil Producing Co.*, 187 Okla. 193, 102 P.2d 124 (1940).

Such give and take, however, suggested to me that the riparian right was as fluid as the water it represented and, indeed, expanded or contracted based upon changing conditions and needs. It also suggested to me that the critical element has not been "the right" but the power by which adjustments have been made over time and at any given time. Although such power has been most commonly exercised by the courts, it is not exclusively within the ambit of judicial power to weigh competing interests, to define or refine legal rights, and furnish remedies and other means to protect such rights. The legislature unquestionably has such power as well.

The 1963 legislation under consideration represented legislative weighing of the competing interests to stream water in Oklahoma, effectively defined reasonable use that might thereafter arise to be domestic use, and provided for appropriation of "unused" stream water after protecting existing reasonable riparian uses and prospective domestic uses. In addition, it provided a comprehensive system to review, manage and regulate the use of stream water. This has furnished a much more viable approach to addressing and protecting the multitude of interests and needs than the ad hoc approach of riparian litigation.

In my analysis, the legislature did nothing more in 1963 than the courts have been doing for decades: define the scope of reasonable use by a riparian. In doing so, it is not beyond the exercise of power to circumscribe uses as of a particular point in time. In *Smith v. Stanolind Oil & Gas*, 197 Okla. 499, 172 P.2d 1002 (1946), the court refused to disturb injunctive relief that restrained an up-stream use *only* insofar as it impaired an *existing* domestic and livestock use of the downstream plaintiffs. The court rejected the plaintiffs' argument that they should have received protection for increased and future uses, as well.

Prospective or future uses by riparians have not been recognized or treated as "vested" any more than the riparian right itself has been treated as an absolute right of property. Accordingly, I cannot agree that such future or prospective uses were untouchable by the 1963 legislation or that the legislature impaired or abrogated a protected right in limiting such future/prospective uses to domestic uses.

HARGRAVE, Justice, dissenting:

I must dissent from the majority opinion. I concur in Justice Lavender's analysis explaining that the 1963 legislative amendments to our state's stream water laws do not constitute a taking of property without just compensation in violation of Oklahoma Constitution, Article 2 § 24. There is no

constitutional prohibition of the legislature's power to define or redefine riparian rights. In addition to these objections the opinion presents additional difficulties. It does not reach far enough to decide the issues presented by the parties. The issues are simply postponed for later resolution under rules here laid out that present a myriad of practical problems themselves.